STATE v. THOMPSON.

(Filed 28 October, 1912.)

1. Murder—Circumstantial Evidence—Footprints—Opinion Upon the
Facts.

　　Upon trial for murder in the first degree for the shooting of
deceased at night through a window of his dwelling, there was
evidence tending to show bad blood existed between the prisoner
and deceased, with threats by the former on the life of the lat-
ter, and other circumstantial evidence tending to establish the
guilt of the prisoner: *Held*, that testimony of a witness was
competent that there were footprints at the time of the shoot-
ing leading from the window through which the fatal shot was
fired to the dwelling of the prisoner, corresponding with the
prisoner's shoes; that upon placing the prisoner in these foot-
prints, they corresponded with his shoes, and placing him un-
willingly at the window with a leveled gun, it was ascertained
that he could readily have fired and killed the deceased at the
place the latter had been shot.

2. Same—Duress—Self-incrimination—Constitutional Law.

　　Upon trial for murder in the first degree, when there is other
circumstantial evidence of the prisoner's guilt, it is not duress to
require the prisoner to place his foot in footprints leading from
the place of the murder to his own dwelling, or to place himself
in such position as to show he could have fired the fatal shot
from a window and killed the deceased, the position of the de-
ceased and point from which the fatal shot was fired being in

evidence, and is not objectionable under Article I, sec. 11, of the Constitution, which declares that every man has a right "not to be compelled to give evidence against himself."

APPEAL by defendant from *Whedbee, J.,* at March Term, 1912, of UNION.

The facts are sufficiently stated in the opinion of the Court by *Mr. Chief Justice Clark.*

*Attorney-General for the State.*
*Redwine & Sikes for prisoner.*

CLARK, C. J. The prisoner was convicted of murder, in the first degree, of one Gus Alsobrooks. The deceased was shot on the night of 8 March, 1912, while asleep in a chair a few feet from a window, by some one standing outside. Quentin, son of deceased, testified that he was sleeping in the bed in the same room; that the dogs began barking outside; that he got up, went to his father and tried to wake him; that while he was standing behind the chair the gun was fired by some one outside. He said that the shot struck the deceased in his eyes and also hit the witness. Another son testified that he was in bed when his father was shot, and when he got up he found Quentin lying on the floor. There was also evidence that preceding the killing there had been bad feeling between the deceased and the prisoner and quarrels and fights between their children; that shortly before, as the deceased was passing the house of the prisoner, he was shot at from ambush by some one. The deceased took out a warrant against the son of the prisoner for such shooting, and the prisoner threatened the deceased that if he did not withdraw the warrant he would not be living when it came to trial.

There was evidence that it had been raining the night of the murder; that tracks were found 3½ or 4 feet from the window, and several persons testified to following the tracks in a roundabout direction to within 50 feet of the prisoner's home, and that the shoes worn by him fitted in the tracks. There was a hard path leading to the house from the place where the print of the tracks ceased. Other tracks a little distance from the prisoner's house, which he admitted to be his, looked like the

same tracks which had been followed by the witness. It was also in evidence that at one place it appeared as if the person making the tracks had fallen and there was a print of his knee on the ground. The prisoner admitted that he had worn overalls that day, and when the house was searched overalls were found with dried mud on the knee. A shell was found close to the tracks which the witnesses had followed to the prisoner's house at about 200 or 300 yards from the house of the deceased.

Clifford Fowler, witness for the State, testified in regard to the tracks found outside the window and to following them to the house of the prisoner. He stated that when the coroner's jury was at the house of the deceased, the prisoner went to the house with his gun and was put in the tracks, and that the prisoner was of sufficient height to have fired the gun. He was then asked, "Tell how the prisoner acted in taking these measurements," to which witness answered: "I like not to have got him up there. He didn't want to go there at all."

"Q. What did he do? A. Some one handed me a gun. I took him around to the window and handed him the gun. I said, 'Sam, get up there; I want to see if you are high enough to do the shooting.' I said, 'You must take the gun.' He did, and stepped up and put the gun over his shoulder. I said, 'Put it to the shoulder just like you were going to shoot it.' He fetched the gun up and did like this [witness crouches down]. He put his feet within 3 or 4 inches of the track. I said, 'Measure it and put your gun up there.' The gun looked like it might have been that distance, about 7 inches from the window.

"Q. State to the jury, after he put it on his shoulder and pointed, if you got behind and sighted to see where it sighted with reference to where deceased was sitting: A. It was on a line, and the shot was on the line."

To the foregoing questions and answers the prisoner entered two objections and excepted. The objections here taken present the question whether the prisoner has been deprived of his privilege against self-incrimination, guaranteed by Article I, sec. 11, of the Constitution, which declares that every man has a right "not to be compelled to give evidence against himself."

It has been frequently held proper, and has become a common practice, to compare tracks found at a place where a crime has been committed with the shoes worn by a suspected person or one under arrest. That was done in this case, and evidence was admitted of the conclusions of the witnesses. Such evidence is not considered as making a person furnish evidence against himself. It is dependent upon physical facts and conditions, and does not depend upon confessions, admissions, or statements of the prisoner.

The testimony of the constable, giving the result of the observation of the prisoner standing at the window and pointing his gun in the direction in which it is known that the prisoner was at the time he was shot, is a physical fact or condition as to which he could testify as in the case of the comparison of shoes and footprints. Wigmore on Ev., secs. 2263, 2265.

In *S. v. Graham*, 74 N. C., 646, it was held that if a prisoner under arrest is compelled by the officer having him in charge to put his shoe in a track found in a field for the purpose of comparison, the result of that comparison is admissible on the trial. *Reade, J.,* said: "Confessions made under duress or under the influence of hope or fear are excluded, because experience shows that they may be influenced by such motives. But no fear or hope of the prisoner could produce a resemblance of his tracks to that found in the cornfield; nor make the shoe fit the track; nor could the fact that the officer made the prisoner put his foot in the track affect the resemblance," and cited from Best on Ev., 283, the cases where a person under duress confesses to have stolen goods and deposited them in a certain place: although the confession of the theft will be rejected, yet the evidence that he stated where the goods were deposited will be received, if they are found there. He cites the numerous authorities that an officer who arrests a prisoner has a right to take from him any property which he has about him which is connected with the charge or which may be required as evidence, such as, for instance, a broken knife corresponding with the broken blade left in the window, which had been opened by a burglar, or a fragment of paper corresponding with the wadding of a gun, or counterfeit money found on the prisoner's

161—16

person, which tends to show the scienter, or a pistol which showed that it had been recently discharged. He adds that if the prisoner had refused to put his foot in the track for the comparison, his refusal to do so would have been competent evidence. He cites numerous authorities.

*S. v. Graham* has been cited with approval. *S. v. Lindsay,* 78 N. C., 501; *S. v. Mallet,* 125 N. C., 725 (citing additional authorities); *S. v. Hunter,* 143 N. C., 610.

The question is not whether the prisoner could have been compelled to take the position and point the gun, or put his feet in the tracks, but the result of such pointing being in the line or direction where the deceased lay, was not duress, and was a matter of evidence to go to the jury, just as whether the shoes fitted the tracks or not. If the prisoner had declined to take the position as requested and point the gun, such refusal also would not have been due to duress, and, as *Reade, J.,* said in *S. v. Graham,* would have been competent evidence for the jury to consider. Nor do we think that the prisoner's contention was valid, that when the witness stated that the prisoner "Didn't want to go there at all," this was merely an expression of opinion. It was the statement of his conduct and appearance on that occasion, as to which the prisoner could have cross-examined the witness. *Sherrell v. Telegraph Co.,* 117 N. C., 363; Lawson Exp. Test., Rule 64; *Tobin v. Shaw,* 71 Am. Dec., 555.

The above are the only exceptions presented in the prisoner's brief, and the others are deemed to be waived. Rule 34, 140 N. C. However, we have examined them, and agree that they do not require discussion.

No error.