S. P. Christy, Ida Ball Warren, and Clifford Stonestreet were indicted for the murder of one G. J. Warren. The defendants Christy *Page 866 
and Warren were found guilty of murder in the first degree, and appealed to this Court. The defendant Stonestreet was found guilty of being an accessory after the fact, and does not appeal.
The evidence tends to show that Ida Ball Warren was born in Forsyth County, near Muddy Creek, about 9 miles from Winston-Salem. At the time of her trial she was 36 years old. She lived in Forsyth (773) County until she was 25 years old, and at that age had established an unsavory reputation. She became acquainted with the defendant Christy before she left Forsyth, and it seems that the two went to Lynchburg, where for a time they lived together, and subsequently they went to Grand Saline, Texas, and, without being married, continued to live together. Christy was a fireman on the Texas Short Line Railroad and Warren boarded with him and his supposed wife.
In 1912 the defendant Warren left Christy, and in company with the deceased, G. J. Warren, came to Winston-Salem, and the two were married immediately after their arrival in that city. Upon coming home from one of his runs, Christy found that the woman and Warren had gone away and had taken all the money he had saved up. He immediately followed them to North Carolina for the purpose, he says, of getting a portion of his money back. He spent only one night in Forsyth County, and then returned to Texas. He did not see Mrs. Warren or the deceased, Warren, on this trip.
In January, 1914, Christy came to Winston-Salem again, saw Mrs. Warren, and after a few days went back to Texas.
In July, 1914, Christy came to Winston-Salem again, arriving there about 11:30 at night. He called up Mrs. Warren on the phone and at once went to the Piedmont boarding-house, which was then being run by Mrs. Warren, and spent the night. Mr. Warren did not know that Christy spent the night in the hotel. Christy got up early the next morning in order to avoid Warren, and went to the home of Mrs. Stonestreet, an illegitimate daughter of Mrs. Warren, and arranged to board there. At Mrs. Stonestreet's the defendants Christy and Warren saw each other every day or two.
On 18 July G. J. Warren disappeared, and has never since been seen alive. On 25 August, 1914, the body of a man was found in Muddy Creek. Two iron weights, one weighing 17 3/4 and the other 68 pounds, had been tied to the body. A rope was tied around the knees of the body and another piece of rope was wrapped tight around the neck several times. The face was badly mutilated on the left side and the teeth in the left lower jaw were broken out and the jaw-bone was broken. There was also a crack in the skull. An inquest was held and the body carried to Vogler's morgue. Subsequently the body was buried in the county cemetery. At this time the body was not identified, no one was *Page 867 
accused of the crime, and the affair was generally spoken of as the Muddy Creek mystery.
About 1 March, 1915, the chief of police of the city of Winston, having received inquiries about G. J. Warren, called on Mrs. Warren at the Piedmont boarding-house and asked if her husband was in, stating at the same time that he, the officer, had a letter in his possession making inquiries in regard to the said G. J. Warren. Mrs. Warren stated that her husband had received a telegram from his mother in (774) August saying she was sick, and that he had left home in August to be at his mother's bedside. She further stated that she had gotten a letter from her husband on 22 October. She told the officer that she had sent out a number of letters in her endeavor to locate her husband. The officer spoke to her about the body which had been at Vogler's morgue, and she said that she had been told that the body was so mutilated and decomposed that she did not think anybody would recognize it; that she did not think about it being Mr. Warren and did not go to see it.
Thereafter, about 1 April, the body which had been found in Muddy Creek, and which had been kept at Vogler's morgue and then buried in the county cemetery, was exhumed and was identified as the body of G. J. Warren. Mrs. Warren was arrested, and after her arrest, without any threat or inducement of any sort on the part of the officers or any one else, she made a statement, the court cautioning the jury at the time that what she said could be considered only against her, and was no evidence against and could not be considered against the defendants Christy and Stonestreet. This statement is as follows:
STATEMENT OF IDA BALL WARREN.
"She stated that on the morning of 18 August she got up about 4 o'clock in the morning and went into the dining-room to begin to prepare for her breakfast; that she had been in the dining-room a few minutes when Christy came in; she said she had left Mr. Warren in the bed asleep. She said Christy came into the dining-room and told her that he had choked Mr. Warren to death, and then Christy went back in the room. She said that he, Christy, then went in her bedroom and put the body in a trunk. I asked her whose trunk, and she said `Ours.' Took the trunk and carried it and placed in room No. 14, and it remained there until about 10 o'clock that day. That Christy drove up in front of the Piedmont House with a two-horse hack, and a negro that was unknown to her came up the steps with him, and they took the trunk and carried it down from room No. 14 to the street, where the hack was standing; that he went to the barber shop, called another negro to help him left the trunk into the hack. Sheriff asked her if they carried the trunk clear as they went down the steps; she said no, they kind *Page 868 
of bumped it down. That she went out on the veranda of the hotel and saw them left the trunk into the hack and saw Christy drive off, and she never had such feelings in her life as she did while they were taking down the trunk and placing it in the hack; she said when she looked at herself in the glass that she was as white as chalk."
STATEMENT OF CLIFFORD STONESTREET.
After the foregoing statement of Ida Ball Warren the chief of police went to see Clifford Stonestreet and asked him to walk around to (775) the office of the chief. Stonestreet said he knew nothing about Warren's watch, whereupon the officer said, "Suppose I told you that your mother-in-law told me she gave you the watch?" Stonestreet replied, "I would say that it was not true." Officer: "Suppose she were to face you with that?" Stonestreet: "I would tell her she was a damned lie." Officer: "We will go to the jail and see whether you will or not."
The sheriff of the county and the chief of police then went with Stonestreet to the jail and into the room where Mrs. Warren was confined. The sheriff then called her to the door and said, "Mrs. Warren, was it the next morning or the next afternoon that you gave Clifford that watch?" Mrs. Warren said she did not remember, but that it was two or three days after Warren was killed, and that she told him he could have the watch; that it was lying on the dresser. Thereupon Stonestreet turned around to the sheriff and the chief and said: "Come on; let's go and get it. She has told all she knows." They then went back to the Piedmont boarding-house, and Stonestreet walked back toward the kitchen and handed the chief the watch. Thereafter Stonestreet was arrested and placed in jail. At this time Christy was under arrest in Texas, but had not been brought back to North Carolina. After his arrest and while he was in jail, without any threats or promises on the part of the officers, Stonestreet told the officers that the night after the body had been placed in Muddy Creek, Christy and Mrs. Stonestreet were sitting in their bedroom at their home on West Sixth Street. He said that on the night of the 19th there was a trunk put in his basement; that he saw the trunk in the basement. He said that he did not take any part in the killing, but that he had knowledge of the killing after Warren's body had been put in the creek. After Christy had been brought back to North Carolina he was taken to the cell where Stonestreet was confined, and said to Stonestreet: "This is a pretty predicament you have all gotten me into." Stonestreet replied: "I got you into nothing." Christy said: "You went ahead and told all you knew about the part I took in the murder. Why did you not tell the part you taken?" Stonestreet said: "I have not played any part." Christy said: "You did not want to tell what you did, but I am going to tell it just like it was. *Page 869 
I do not deny the part I taken, and I am going to tell the truth about the part you taken." He said to Stonestreet: "Didn't you go with me to Muddy Creek that night and help put the body in the creek?" and Stonestreet said: "No, I did nothing of the kind." Christy: "You did not hit him in the face with a short-handled axe?" Stonestreet: "No, I didn't." Christy: "You haven't got a short-handled axe, with the handle sawed off, have you?" Stonestreet: "Yes; but who sawed the handle off?" Christy: "We are not talking about who sawed the handle off; we are talking about who hit Warren with it." Stonestreet then said he did not know a ___________ thing about it; that he had not told (776) anything except what he had to tell, but that the old lady had told it all.
The sheriff of Forsyth and the chief of police of the city of Winston went to Texas after Christy, and on the way back, without any sort of inducement or threats, he, after being told that anything he said would be used against him if it bore upon the case, Christy made a statement to the officers, the court warning the jury repeatedly when this statement was admitted in evidence that it could not be considered against Warren or Stonestreet.
STATEMENT OF SAMUEL PRESTON CHRISTY.
He said he was living in Grand Saline, Texas, with Mrs. Warren. That he had a position on the Texas Short Line as fireman. That G. J. Warren was boarding at his house; that he made two runs a day; he left early in the morning and got back to Grand Saline, and did not have time to go home for his meals, and did not go home from the time he left early in the morning until some time in the forepart of the night. On arriving home the night Mrs. Warren left him, don't remember the date, he found Warren and Mrs. Warren were gone, and all the money he had saved up had been taken, except a check for $15 he had in his pocket. He found she had made several bills there, buying ladies' furnishings, bracelets, and some other stuff; that he took the $15 check and went down the road in the direction of Louisiana, thinking they had gone to Warren's home; that he got information that they had come to North Carolina; he went back and borrowed $50 and came to North Carolina in hope of getting some of his money back. He came here and went out to Will Henning's; had information they were there. He found Pearl there, Mrs. Stonestreet, daughter of Mrs. Warren. Mrs. Warren and Mr. Warren were not there. Mr. and Mrs. Henning got excited when he came in, thinking there would be trouble, but he told them all that he wanted was his money, or part of it, and he told them there would be no trouble. He stayed all night and did not get to see Mrs. Warren.
Mr. Henning went with him to the railroad; that he went to some *Page 870 
point in South Carolina, and from there went back to Grand Saline, Texas. In about five or six months he received a letter from Mrs. Warren. He said he received a letter from her begging him to come; so he came here in January. She wrote and told him where she was living, gave him the number and street address. When he got here she had designated a place in Fairview. He went in and stayed a short while, and she told him where he could get a room overnight. The room she directed him to was almost in front of Fairview market; said he secured the room and saw Warren as he went on to work. She told him to come back to her house the next morning; she wanted to have a talk with him. About 8 or 9 o'clock next morning he went back and stayed about two and one-half hours at her house. Mrs. Warren said Mr. Warren (777) was mistreating her, and she could not stand his mistreatment. She told him Warren had been hurt, and that she had had a doctor with him, and waited on him, but that if he ever got hurt again she was going to give him the slip. Was not going to do anything for him. He told her if Warren was mistreating her to call in the officers; they were the proper ones to correct him. She said she could not afford to do that on account of her past life; that if she got into the courthouse he would expose her past life, and she could not afford to go into court. He said he stayed around for a few days and went back to Grand Saline. She wrote him to come and help her out of her trouble. He wrote her he was sick and unable to come, which was untrue. He said he thought he could throw her off. Said in July she kept writing to him, and he did not know what made him do it, but he came here. She wrote him that when he came to call her up; that he got in on the 11:35 train at night, and called her up from the depot. She said everything was all right, and to come to the Piedmont House. He went there and she put him in room No. 3 to spend the night. Told him where Mrs. Stonestreet was living, and for him to get up early next morning and go there before Warren got up, which he did. Said he saw her every day or two; that she would come to Mrs. Stonestreet's, and she was wanting him to make away with Warren. She tried to get him to go down to the tower where Warren was at work and shoot him. She said there in the dark he could shoot him and place his body on the track, and nobody would know about it, or know how it came there. She told him that she had tried to get rid of him by poisoning him; that she put Paris green in a bowl of soup on one occasion, and put in too much and he would not drink it, and on another occasion Mr. Call sent her a bottle of wine and when Warren came from work she asked him if he did not want a drink of wine, and he said "Yes." She got crushed ice and put in it, and got some quicksilver and put in it, and when he drank it he got the quicksilver in his mouth and would not drink it. Said the next plan was at *Page 871 
Stonestreet's house; they planned to kill him one Saturday night. They hired a horse and buggy and put it in the back yard, and their plan was to get Warren out there and knock him in the head and take him away with this horse and buggy and dispose of his body. They were to tell him Stonestreet's wife was sick in order to get him out there. It was on Saturday night, and Warren came and did not find things around there as he expected them to be, so he went back home, and they did not get to accomplish their purpose.
He said he got the horse and buggy from a livery stable on Main Street, near Salem Creek. He carried the horse and buggy up there, stayed in the back yard all night. Next morning Stonestreet took his wife and sister and went out driving to Mrs. Warren's old home place at Muddy Creek. Came back about 11 o'clock and he took the horse and buggy to the stable. He said the next morning they were out (778) at Stonestreet's house and Mrs. Warren said she knew of a plan now that would work. They could get some chloroform and she could chloroform him; then they could choke him to death and carry his body away. She said she had tried it and knew it would work. She had a small bottle that she had used on him once, and next morning he complained of being sleepy, and that if she had enough she knew it would work. She asked him to get a bottle of chloroform and if Stonestreet could get a bottle she would have plenty to do the work. Said he went out to McArthur's drug store and got a 25-cent bottle of chloroform, took it back to Stonestreet's house and give it to Stonestreet, and Stonestreet gave it to Mrs. Warren, and the next thing he knew about it was the morning of the murder. Said Stonestreet left home before breakfast early in the morning and came back for breakfast about 7 o'clock and told him he had Warren's body in the trunk and that now he would not bother anybody else, or would not give them any trouble. Said the understanding was that Stonestreet was to get a bottle of chloroform and Christy was to get a bottle and turn it over to Mrs. Warren; that she was to chloroform him; Stonestreet was to choke him to death, and that he was to take the trunk and make away with it. The morning of the murder Stonestreet came in and told him that he had the body in the trunk; he said he was to take the body out of the house about sundown. A little later after that Stonestreet told him the body was in the trunk, and told him that Mrs. Warren wanted him to get the trunk out of the house just as quick as he could; that the weather was so warm she was afraid the body would begin to smell, and the trunk begin to leak and the servants would notice it. Stonestreet told him to go to the livery stable and get a hack; said he went to Fisher's livery stable and got a hack about 10 o'clock. Told the liveryman to take out the back seat of the hack; that he was going to haul a trunk and would not need seats in it. Said he *Page 872 
got the hack and picked up a negro, did not know who, to help him bring the trunk down. He and the negro brought the trunk down from Mrs. Warren's bedroom. Did not tell where the trunk was sitting in the bedroom. The trunk was so heavy that he stepped to the Antiseptic Barber Shop and asked a boy to help him; said he gave him a 5-cent piece. Said Mrs. Warren and Stonestreet were both standing looking at him when he got in the hack. He got in the hack and started up Trade Street. Stonestreet passed him when he was on Trade Street, on a bicycle. Stonestreet went on home on Boulevard back to his house. Came back, passed a few words, and he went out in the direction of Pfafftown, turned off a road unused, playing for time, waiting for night; did not want to go to Muddy Creek until dark. About sundown he drove back to Stonestreet's house, same way he went out. Stonestreet came down there and got a short-handled axe, put it in the hack and got (779) in the hack and drove back up Summit Street to Fourth Street and out to Hanes' Mill to Muddy Creek; drove as near as they could get the hack, and took the trunk out of the hack. Stonestreet carried it on across a field to the creek and opened it; took out the body and went back to the hack and got the weights, carried them there and put them to Warren's body. Stonestreet took a short-handled axe, hit him one or two licks in the face and rolled him in the creek, and said he would never bother anybody else, but would make food for the fish. He put the clothing in the trunk and put the trunk in the hack and carried the trunk back to Stonestreet's house, and put it in the basement. He took the hack back to the livery stable. The man in charge of the stable said he owed $1 extra for keeping the hack overtime. He came back to Stonestreet's house and went to bed. He saw some blood on his pants the next morning and thought he would wash them, and then decided to burn them. He took the axe and trunk and set fire to the trunk, but the clothes were wet and he was afraid the people would see too much smoke in the basement. He took the rest of the trunk and clothing and buried them; said after the body was found and placed in the morgue he went down to see it, and went back and Stonestreet asked him how it looked, and he told him he did not believe anybody would ever be able to recognize it. "Christy told me he left here some time in September, got back to Grand Saline on the same day of the month that he left there in July. The axe was shown Christy at the jail."
There was evidence as to the findings of the axe, pieces of the trunk, and the clothing that Christy wore on the day of the homicide, in the basement of the Stonestreet house. There was also evidence from the keepers of the livery stables that Christy got the buggy and the hack on the days mentioned by Christy in his statement, and kept them during the time stated by Christy. Of special interest is the fact that it *Page 873 
appears from the testimony of the keeper of the livery stable that Christy got the hack on the morning of 18 August and did not return it until 11 o'clock that night.
A woman named Lummy Davis testified that she was in jail with Mrs. Warren and was put in the hall used by Mrs. Warren. That one day she asked Mrs. Warren, "How come you all to kill Warren?" Mrs. Warren answered, "I knew what was best for me, and who was doing for me." Lummy Davis: "You did not have any business doing that." Mrs. Warren: "I did not want to leave him behind." This witness further testified that she overheard a conversation between Mrs. Warren and Christy; that she heard Mrs. Warren say: "You go on the stand and swear first, and we will take particular notice of what you swear and will swear the same thing. You go on the stand and swear you killed him in self-defense. You swear he took his gun out of his pocket and you picked up a rock and hit him in the head and killed him." This witness further testified that Mrs. Warren (780) told her that Warren's body was placed in her trunk, carried out from her house at 10 o'clock in the morning so that people will not suspicion anything, but would think that it was boarders going from the house, as boarders went out all the time.
The foregoing is a synopsis of the testimony for the State.
The defendant Ida Ball Warren went on the stand and testified in her own behalf as follows:
"I am 36 years old; born out towards Clemmonsville, 9 miles from here; was 25 years old when I left the county. Went first to Lynchburg; lived there two years; then to Texas; came back here after being in Texas; stayed about a week in the settlement of my father's estate; lived in Grand Saline, Texas, not quite two years. During the time I lived in Grand Saline, Texas, and Lynchburg, Christy and myself lived together as man and wife. Left Grand Saline, Texas, in December, 1912; arrived here about the 9th of December and was married to Mr. Warren. We first lived on East Fourteenth Street until March a year ago; we then came to the Piedmont House; I was employed to run it by Mr. Call until March, 1915; from that time I ran it in my own name. My daughter Pearl married Clifford Stonestreet when she was 15; she is now 16 years old; they lived a while on West Thirteenth Street, then on East Fourteenth Street; then went to live on West Sixth Street with her husband, and was living there on 18 August, 1914. Her child was born 28 September, 1914. I never saw Christy after I left him at Grand Saline, Texas, in December, 1912, until January, 1914. I lived then on East Fourteenth Street. To my knowledge he remained in Winston-Salem only one night; came one evening, left next day; next time I saw him was July, 1914. I was then employed by *Page 874 
Mr. Call to run the Piedmont boarding-house. Christy came there one night about 11:30 o'clock; stayed all night at the hotel. Mr. Warren did not know he stayed there. Next morning he went to my daughter's, Mrs. Stonestreet, and boarded there. I saw him while he was boarding with her. I was out at my daughter's house during the month of August, 1914; my daughter was not well. I went there probably twice a week. She was expecting to be confined. On the night of 17 August Christy came to the hotel about 11:30 o'clock; stayed in room 14. I told my daughter any time she felt like she did not want him at her house she could send him down and let him stay at the hotel. Mr. Warren did not know of this arrangement. Mr. Warren and myself slept in room 9, in the rear of sitting-room at the head of stairs. This was my bedroom. I got up on the morning of the 18th about 4:30 or 5 o'clock; first went to the kitchen; then went to wake up Christy in room 14. While in there Mr. Warren came in the door through the sitting-room. He saw us together, and said: `What are you doing here, you son (781) of a bitch? I am going to kill you,' and he rushed over there with his hand like he was going to pull his gun out. Christy jumped up and grabbed him by the arm, and they scuffled around, and in the scuffle I ran out of the room. I went away through the back hall door. Christy came to me afterwards in the dining-room and said he had had a terrible fight in there and was afraid he had hit Warren hard enough to kill him. Said he did not know what to do. I was scared so bad I could not speak. I did not tell him what to do. I did not know. I did not go back in the room where I left them fighting. Don't know what he hit him with, but I think with a monkey wrench. He did not tell me he hit him with a wrench. Christy said he did not know what to do; it was going to cause him lots of trouble, and me too, and I did not know what to do, I was scared so bad. He said he was going to put the body in a trunk and did not know what to do with it, but he was going to do something with it. I never saw Mr. Warren after he was dead. I saw a colored man and Mr. Christy take the trunk down to the sidewalk, load it in the hack; I was standing in the sitting-room at the window, which was open, and fronts on the street. I never saw Christy after that until the next day. Stonestreet was not at the hotel the night of 17 August. He ate his dinner and supper there every day; was working for Mr. Call. I saw the chief of police and showed him the letters he testifies about. I never had any conversation with my sister, Mrs. Henning, about this matter. She told me one day when we were going from the hospital along the street that it was talked about Mr. Warren being gone; then she said that Lula, her son's wife, said she did not doubt much that being Mr. Warren who was found in the creek. I said I did not know, and said it was an awful burden to accuse me of doing such a thing. I *Page 875 
did not tell her I planned the murder. I have been in jail since April. Ethel Ward and Lummie Davis have been in jail with me. I heard Lummie Davis testify to a conversation she heard me and Christy have in jail. I had no such conversation with Christy, nor did I holler across to Christy to swear that he fought in self-defense and that the other witnesses would come along and testify accordingly. I never had any conversation with Christy in the presence of Lummie Davis, nor have I had any conversation with him since I have been in jail. I did not have any buggy whip in the Piedmont boarding-house where I lived. I did not advance Stonestreet the money to pay Christy for the hack or cost of the buggy. I know nothing about the buggy ever having been carried to Stonestreet's house. I never had in my possession or attempted to use any chloroform. Mr. Call gave me a bottle of wine, but I did not put quicksilver in the wine and offer it to Mr. Warren. I never attempted to poison him by putting something in his soup; I never tried to give him chloroform, and I never tried to get Christy or any one else to shoot him while he was at work at the tower. Warren had a pistol. Christy took it with him when he left. (782) Last time I saw the pistol it was lying on the mantel board in room No. 9. I thought Warren was asleep, and left him in bedroom No. 9 on the morning of the homicide. I never wrote Christy may letters asking him to come back and kill Warren. I do not know of my knowledge that Christy came here in 1912. I did not see him. I had nothing to do with the disposition of the body of my husband; have not been to Muddy Creek since I left home a number of years ago. I did not go to the morgue to examine the corpse. I took no part in the murder of my husband and know nothing of it except what I have said here, and what I said to the officers. I was never married to Christy. I had one child before I met Christy, the wife of Clifford Stonestreet; she was 7 years old when we went to Lynchburg to live; she thought Christy was her father until this trouble. I had so told her and never told her any better. I have never been in court before. I never entered into any combination and conspiracy in going out to Stonestreet's house to kill Warren. I was not there on the 8th of August, when it was alleged the buggy was left there. I heard about them going to drive that morning; that was the first time I ever heard of it. I gave Mr. Warren's watch to Stonestreet about a week or two weeks after the homicide. I did not tell him Warren had been killed, and to my knowledge he did not know it."
There were seventy exceptions taken, but in their briefs the counsel for Christy group their exceptions under eight heads and the counsel for Warren group their under seventeen heads.
The court permitted the solicitor to ask certain jurors whether or not they belonged to the Society of Friends without challenging them for cause. The object of the inquiry was to ascertain whether or not the jurors had conscientious objections to capital punishment. The prisoners except because this was not treated as a challenge for cause. It has always been very questionable practice whether when the State asked questions for information on which to base the challenge for cause the defendant could "admit the cause." One of the objections to the refusal to the State of the right to appeal is because this and other practices could not be brought up on exception by the State. Under this practice the solicitor dare not ask a single question to give him information about a juror lest the juror be summarily set aside. This was one of the methods in addition to the great disparity in the number of peremptory challenges (23 to 24) which practically placed the selection of the (783) jury in the hands of the counsel for the prisoner. Now, however, section 6, chapter 31, Laws 1913, has put an end to this practice and warranted the action of the judge.
Another exception is to the admission of a letter purporting to have been written by the deceased to Ida Ball Warren on 22 October, 1914. While the contents of the letter were immaterial to the issue, its admission was competent to show that she had in her possession a letter which she claimed was from her husband when she knew at the time he had been dead for several months. It tended to show that she had sent out letters ostensibly to locate her husband when at the time she wrote them she knew he was dead.
The prisoners except that the court did not warn the jury that any statement made by one of the prisoners not in the presence of the others could not be considered except against the one making it, and was no evidence against the others. It is not necessary in this case to recall the rule of practice set out by this Court, 164 N.C. 548: "It will not be ground of exception that evidence competent for some purposes, but not for all, is admitted generally, unless the appellant asks at the time of the admission that its purpose shall be restricted," for the record shows that the judge, on the admission of the evidence, and again in the charge, called the attention of the jury to the fact that the admission or statements of one of the prisoners was competent only against the party making it and should not be considered as against the others.
The counsel for the defense strenuously insist that declarations made by the prisoners while in custody or in jail are incompetent, though the court found upon evidence that they were made voluntarily and without *Page 877 
any inducement of hope or fear. This Court has repeatedly held that such statements are competent. S. v. Drakeford, 162 N.C. 667, and cases cited.
It is also well settled that whether a statement is voluntary is a preliminary question of fact, and that the finding of the judge cannot be reviewed if there is any evidence to sustain it. S. v. Page, 127 N.C. 512. A confession is deemed to be voluntary unless the party against whom it is offered shows facts to the contrary. S. v. Sanders, 84 N.C. 728. This rule is also followed in Massachusetts, Missouri, New Jersey, New York, Ohio, South Carolina, and Texas, and some other States, though in some States the presumption is that confessions are involuntary and the State must offer evidence to the contrary. But in all the States when the court finds the fact that the confessions were voluntary this is conclusive if there is evidence to sustain it.
The prisoner Christy objected to a statement made by him, but the evidence as set out warrants the finding of the court, if we could review it, that the statement was voluntary. It was made on the train while Christy was being brought back from Texas under extradition papers. The officer had showed Christy the Winston papers giving (784) information in regard to the case and, among other things, a confession by Ida Ball Warren, and told Christy that he believed he had followed her and her husband from Texas; that he did not believe that one man could have committed the crime. Christy afterwards asked if anything he said would be taken against him, and the officer replied that it would if it had any bearing on the case. He then said: "I know all about it and they know all about it. I am going to tell the whole thing." He said, "We are all in it." The officer testified that he did not carry him these papers in order to get Christy to tell, but in order for him to see what was being said in Winston without himself having to tell Christy.
We see in this no hope or threat held out by the officer, but, on the contrary, he warned Christy that anything he said bearing on the case would be used against him. Doubtless Christy told what he knew to rebut the statement made by Ida Ball Warren in the paper, because he deemed it unfair to himself, and did not wish to let it stand uncontradicted. There was no impropriety in letting the prisoner see the papers; indeed, this would have been a positive benefit to him in preparing his defense to meet the charges therein made, if untrue.
The prisoners also earnestly press the exception that there was not sufficient evidence to go to the jury that the prisoners had entered into a conspiracy to kill the deceased. The statement by Christy, if believed by the jury, is sufficient to sustain the verdict against him. He states that for years he had lived in illicit relations with his codefendant; *Page 878 
that she deserted him in Texas and ran away with the deceased; that he made three trips from Texas to North Carolina to see her; that she received him in her house at intervals and sent him to her daughter's house, where she frequently met him; that they both tried to keep her husband, Warren, in ignorance of the fact that Christy was in Winston; that she repeatedly tried to get him to shoot her husband, and that she and Christy and Stonestreet planned to kill Warren at Stonestreet's house one Saturday, and that, when this miscarried, Warren's wife next proposed that she would chloroform her husband and then Christy and Stonestreet could choke him to death. There was a cord around the neck when the corpse was found. Christy further said that he furnished the chloroform for that purpose, and thereafter they told him that Warren was dead, and he put the body in a trunk, hauled it around Winston all day long, and at night endeavored to sink the body in the waters of Muddy Creek. These facts were not only sufficient to show conspiracy, but if believed admit of no other conclusion.
As to the prisoner Ida Ball Warren, there was also evidence to sustain the charge that she was a party to the conspiracy to put her husband to death. For years she had lived with Christy as his paramour, till she deserted him, and, coming to North Carolina with Warren, (785) married him. A year thereafter Christy came to Winston without the knowledge of Warren. He was brought to her room and was sent away by her before day before her husband awaked. Christy was sent by her to the home of her illegitimate daughter, where the prisoner Warren often met him. On the night of the homicide Christy went to her home, stayed there all night, and the next morning between 5 and 6 Warren was killed. She made no outcry, though testified that she knew the deed was being done. She furnished her trunk in which to put the body, and coolly saw it "dumped down" the steps with the body of her husband doubled up in it. When the officer came to inquire about her husband, months afterwards, she told him he had gone to the bedside of his sick mother, and showed him a letter purporting to have been written by her husband months after he was dead. When arrested she stated that Christy came in and told her he had choked her husband to death, and in jail she told Christy, according to the evidence, to swear that he had killed Warren in self-defense, and when Christy refused to go on the stand, she did so herself and swore it. Upon the evidence she seems to have been the moving spirit in the murder, the veritable Lady Macbeth of the tragedy. Her sister, Mrs. Henning, testified that Mrs. Warren said to her, "I planned that murder."
Upon the record the husband of the prisoner, Warren, was put to death by his wife and her paramour by a preconcerted, predetermined *Page 879 
murder, cold blooded and relentless, without any mitigating or extenuating circumstances.
We find no error in the conduct of the case by the learned judge, and the twelve jurors have found their verdict upon competent evidence which justified their conclusion.
No error.
Cited: S. v. Rodman, 188 N.C. 724 (4f); S. v. Grier, 203 N.C. 589
(4g); S. v. Moore, 210 N.C. 692 (4f); S. v. Caldwell, 212 N.C. 489 (4g);S. v. Richardson, 216 N.C. 305 (4g); S. v. Smith, 221 N.C. 407 (4f); S.v. Biggs, 224 N.C. 26 (4l).