STATE v. JOHN HENRY ROGERS.

(Filed 11 April, 1951.)

**1. Homicide §§ 4d, 25—Murder committed in perpetration of robbery or rape is murder in the first degree.**

Where the State's evidence tends to show a murder committed in the perpetration of robbery and rape, and tends to identify defendant as the perpetrator of the crime by testimony of his confession, foot tracks, presence at the scene shortly before the crime was committed, discovery of articles connected with the crime in his possession or where he had hidden them, together with other circumstantial evidence and testimony of conflicting statements made by him when questioned after the occurrence, *is held* sufficient to be submitted to the jury on the charge of murder in the first degree.

**2. Criminal Law § 42d—**

Where a State's witness testifies concerning certain matters, testimony of consistent statements made by the witness prior to the trial is properly admitted for the restricted purpose of corroboration.

**3. Criminal Law § 38c—**

Where the State's evidence tends to show that a wrist watch was worn by the deceased at the time of the homicide and that it was subsequently found detached from her person where the death-dealing blows were apparently struck by her slayer, the State is entitled to offer the watch in evidence and exhibit it to the jury.

**4. Criminal Law § 38d—**

Where the photographer identifies pictures made by him and states they were correct and true representations of the body of the deceased and the place where it was found, the photographs are rightly received in evidence for the limited purpose of explanation or illustration, notwithstanding that they may be of a shocking nature and tend to arouse passion or prejudice.

**5. Criminal Law § 33—**

An extrajudicial confession of guilt by an accused is admissible against him when, and only when, it was in fact voluntarily made.

**6. Same—**

A confession is presumed voluntary until the contrary is made to appear.

**7. Same—**

Where the voluntariness of a confession is challenged, the matter is to be determined by the trial judge after affording both the prosecution and defense a reasonable opportunity to present evidence on the question in the absence of the jury.

STATE *v.* ROGERS.

**8. Same—**

The admissibility of a confession is to be determined by the facts appearing in evidence when it is received or rejected, and not by the facts appearing in evidence at a later stage of the trial.

**9. Same—**

The finding by the trial court that a confession is voluntary is not subject to review if it is supported by any competent evidence.

**10. Same—**

A confession is not rendered incompetent by the mere fact that the accused was under arrest or in jail or in the presence of armed officers at the time it was made.

**11. Same—**

Where, on preliminary inquiry, the State offers testimony tending to show that defendant's confession was voluntarily made, and defendant, after being afforded an opportunity to do so, offers no evidence to the contrary, the ruling of the trial court that the confession was voluntary is conclusive, since it is supported by the evidence at the time of the admission of the confession in evidence.

**12. Criminal Law § 31e—**

Where the State's witness testifies that he has studied the science of comparing fingerprints and footprints of human beings for the purpose of identification and had had years of practical experience in such work, the trial court properly admits testimony of the witness that the bare footprints found at the scene of the crime were identical with prints taken from defendant's corresponding foot when the evidence discloses that the prints found at the scene of the crime could have been impressed only at the time the crime was perpetrated.

**13. Same: Constitutional Law § 35—**

Objection by defendant that the taking of his footprint violated his constitutional right not to be compelled to give evidence against himself, Constitution of N. C., Article I, Section 11, *held* untenable both because the evidence disclosed defendant voluntarily suffered his footprint to be taken and because the constitutional protection does not extend to physical facts.

**14. Criminal Law § 56—**

Motion in arrest of judgment on the ground that the grand jury which indicted defendant had not been sworn cannot be allowed when the record proper reveals that the requisite oath was administered to all the grand jurors.

APPEAL by prisoner from *Burney, J.,* and a jury, at the October Term, 1950, of SAMPSON.

Criminal prosecution upon an indictment charging the prisoner with the murder of Mrs. Eunice Kornegay.

The facts shown by the State's evidence are as follows:

1. Mrs. Kornegay, a white woman, lived with her husband, Lester B. Kornegay, near the Piney Grove School in a rural section of Sampson County. He operated a small store, which stood near his residence and fronted on a paved highway. On the opposite side of the highway was a field, which had a depth of 100 yards or more and ended at a ditch on the edge of a dense wood. The prisoner, John Henry Rogers, a Negro man, who sometimes traded at the Kornegay store, lived about a mile away as the crow flies.

2. On 15 June, 1950, Lester B. Kornegay put Mrs. Kornegay in charge of the store, and went to Carolina Beach to fish. He left some sixty-five dollars in silver coins in a money box in a showcase inside the store. Mrs. Kornegay was last seen alive by the State's witnesses just after 3:15 p.m. unlocking the front door of the store for the apparent purpose of selling merchandise to the prisoner, who was standing nearby. The prisoner wore khaki pants and was barefooted. He was next seen between 5 and 6 p.m. a mile and a half away, coming out of some woods from the direction of the Kornegay store.

3. Lester B. Kornegay returned about 7 p.m., found the store locked up, and could not locate Mrs. Kornegay or the key. Becoming alarmed, he called on others for assistance, and a search ensued. The searchers discovered a fresh trail on the opposite side of the highway from the store, which had patently been made by dragging some object through the field, across the ditch, and into the dense wood beyond the ditch. They observed the imprints of bare feet at two or three places along the trail in the field, and found "a large quantity of blood and hair in the ditch." Nearby lay a wrist watch habitually worn by Mrs. Kornegay, and several broken pieces of wood "two or two and a half feet long," whose heavy ends were sticky with blood and hair.

4. The trail ended in the dense wood 25 yards beyond the ditch. Here the body of Mrs. Kornegay was found. Her skull had been fractured, and her left arm had been broken between the elbow and the hand. The left side of her head had been beaten until it was "just a mass of hair, flesh, and blood." "She had evidently been dragged across the field, feet first. All her clothes were rolled up around her breasts, and she was completely nude from there down." When discovered, her body rested on the back with the legs extended and widely separated. A sanitary napkin, which had apparently been removed from her person, lay beside the body. Medical examination revealed that death had resulted from the fracture of the skull.

5. On the morning of the next day, *i.e.,* 16 June, 1950, the store was opened and inspected by Lester B. Kornegay, Sheriff P. B. Lockerman,

and James Bradshaw, a representative of the State Bureau of Investigation. The inspection disclosed that a portion of the silver coins had been removed from the money box; that there was a puddle of blood, "five by eight or ten inches" on the floor "next to the icebox," which contained beverages; that a bag of onions had been placed upon the puddle of blood; that a copy of a newspaper, to wit, the *Sampson Independent,* dated at Clinton, North Carolina, on 15 June, 1950, lay on the floor "twelve or eighteen inches from the puddle of blood"; and that the exposed front page of the newspaper bore the imprint of a bare foot. Subsequently, to wit, on 21 June, 1950, James Bradshaw took the footprint of the prisoner, who was then confined to jail on the present charge, and compared it with that found on the newspaper, and ascertained that the two footprints were identical.

6. Meanwhile, to wit, immediately after the discovery of the body of Mrs. Kornegay, peace officers of Sampson County visited the prisoner at his home, and questioned him concerning his activities and whereabouts on the preceding afternoon and the source of a small quantity of silver coins he had in his possession. The prisoner stated that he had borrowed the coins, that he had not been near the Kornegay store for many days, that he had worn blue pants during the afternoon, and that he had spent the entire afternoon working for Percy Flowers. The falsity of these statements was disclosed by subsequent investigation, and the prisoner was arrested and jailed to await trial for the murder of Mrs. Kornegay.

7. For sometime next succeeding his incarceration, the prisoner made contradictory and sometimes fantastic statements either disclaiming all knowledge concerning the death of Mrs. Kornegay, or charging various others with perpetrating the homicide. On 22 June, 1950, however, he told Sheriff Lockerman that "he was guilty of murder, but . . . was not guilty of rape and robbery." On 25 September, 1950, he made the following confession to Sheriff Lockerman and Deputy Sheriff Weeks in the Sampson County jail: That he went to the store on the afternoon of 15 June, 1950, wearing khaki pants and carrying a wrench in his pocket; that after buying a beverage from Mrs. Kornegay, he struck her with the wrench, knocking her to the floor in an insensible state; that he picked her up, and "toted" and dragged her to the ditch, where she regained consciousness; that he thereupon beat her into insensibility with pieces of wood, which he left on the ditch bank, and dragged her onwards into the dense wood, where he abandoned her; that he returned to the store, took "two dollars in change" from the money box, and placed a sack of onions on a puddle of blood, which marked the spot where Mrs. Kornegay had fallen to the floor; and that he then locked the store up and departed from the premises.

8. Immediately after making these statements, the prisoner piloted peace officers to places where he said he had put the wrench and khaki pants, and produced a wrench and unearthed a rotting pair of khaki pants, which he identified as the wrench and khaki pants mentioned in his confession. While on this trip, the prisoner stated to three of his acquaintances in the presence of Deputy Sheriff Weeks "that he was the one that killed Mrs. Kornegay, and that he didn't know why he did it."

The prisoner testified in his own behalf that he wore shoes on the afternoon of 15 June, 1950; that he was not in the Kornegay store on that day; that he did not kill Mrs. Kornegay; and that he was afraid and "didn't know what he was doing" when he allegedly confessed to the officers. Witnesses for the prisoner deposed that they saw him between 5 and 6 o'clock on the afternoon of the homicide, and did not observe any blood on his person or clothing.

The jury returned a verdict finding the prisoner guilty of murder in the first degree, but did not recommend that his punishment should be imprisonment for life in the State's prison. The trial court entered judgment that the prisoner suffer death by the administration of lethal gas, and the prisoner excepted and appealed, assigning errors.

*Attorney-General McMullan and Assistant Attorney-General Bruton for the State.*

*James F. Chestnutt and Robert C. Wells for the prisoner, appellant.*

ERVIN, J. The prisoner insists primarily that he is entitled to a reversal for insufficiency of testimony. This claim is insupportable. The evidence for the State warrants the inference that the prisoner killed the deceased in an attempt to commit a rape and a robbery upon her. Hence, it sustains the verdict and the resultant judgment, for the relevant statute expressly provides that "a murder . . . which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, shall be deemed to be murder in the first degree." G.S. 14-17 as rewritten by Section 1 of Chapter 299 of the 1949 Session Laws of North Carolina; *S. v. Streeton,* 231 N. C., 301, 56 S.E. 2d 649.

The prisoner contends secondarily that he is entitled to a new trial because the trial judge erred in permitting the State's witness, Alton J. Jordan, to testify as to extrajudicial statements made to him by Lester B. Kornegay; in admitting the wrist watch of the deceased; in receiving photographs of the body of the deceased, and of the place where it was found; in permitting Sheriff Lockerman and Deputy Sheriff Weeks to testify as to extrajudicial confessions made by the prisoner in their presence; and in permitting James Bradshaw, the representative of the

State Bureau of Investigation, to testify as to the footprint found in the store and the footprint taken from the prisoner.

The State's witness, Alton J. Jordan, gave evidence of statements made by Lester B. Kornegay before the trial as to relevant things he observed at the store and in the field and wood upon his return from Carolina Beach. Kornegay had already testified for the State concerning the same matters, and the evidence of Jordan was rightly received under the rule that a witness may be corroborated by proof that on a previous occasion he has made statements corresponding to the testimony given by him at the trial. *S. v. Tate,* 210 N.C. 613, 188 S.E. 91; *S. v. McKeithan,* 203 N.C. 494, 166 S.E. 336; *S. v. Rhodes,* 181 N.C. 481, 106 S.E. 456. The trial judge restricted the evidence of Jordan to corroborative purposes at the time of its admission. See: *S. v. Johnson,* 218 N.C. 604, 12 S.E. 2d 278.

The testimony for the State tended to show that the wrist watch was worn by the deceased at the time of the homicide, and that it was subsequently found detached from her person at the place where the death-dealing blows were apparently struck by her slayer. This being true, the State was entitled to offer the watch in evidence and to exhibit it to the jury in the courtroom to enable the jury to understand the evidence, and to realize more completely its cogency and force. *S. v. Speller,* 230 N.C. 345, 53 S.E. 2d 294; *S. v. Westmoreland,* 181 N.C. 590, 107 S.E. 438.

The State laid a proper foundation for the introduction of the photographs by the testimony of James Bradshaw, the person who made them. He identified them, and stated that they were correct and true representations of the body of the deceased, and of the place where it was found. The photographs were then admitted in evidence by the trial judge for the restricted purpose of enabling the witness to explain or illustrate to the jury his testimony as to the condition of the deceased's body and as to the place where it was found. The prisoner insists that the receipt of the photographs even for this restricted purpose constituted error because of their shocking nature and their tendency to arouse passion or prejudice. A similar argument was rejected in the recent case of *S. v. Gardner,* 228 N.C. 567, 46 S.E. 2d 824, where *Mr. Justice Winborne* declared that "if the testimony sought to be illustrated or explained be relevant and material to any issue in the case, the fact that an authenticated photograph is gory, or gruesome, and may tend to arouse prejudice will not alone render it incompetent to be so used." Inasmuch as the testimony of the State's witness, James Bradshaw, respecting the condition of the deceased's body and the place where it was found bore directly upon the crucial issues in the case, the photographs were rightly received in evidence for the limited purpose of explanation or illustration. *S. v. Chavis,* 231 N.C. 307, 56 S.E. 2d 678.

The rules of law germane to the exceptions reserved by the prisoner to the admission of the confessions allegedly made by him in the presence of Sheriff Lockerman and Deputy Sheriff Weeks are summarized in the next paragraph.

An extrajudicial confession of guilt by an accused is admissible against him when, and only when, it was in fact voluntarily made. *S. v. Thompson,* 227 N.C. 19, 40 S.E. 2d 620; *S. v. Moore,* 210 N.C. 686, 188 S.E. 421; *S. v. Anderson,* 208 N.C. 771, 182 S.E. 643. A confession is presumed to be voluntary, however, until the contrary appears. *S. v. Mays,* 225 N.C. 486, 35 S.E. 2d 494; *S. v. Grier,* 203 N.C. 586, 166 S.E. 595; *S. v. Christy,* 170 N.C. 772, 87 S.E. 499. When the admissibility of a confession is challenged on the ground that it was induced by improper means, the trial judge is required to determine the question of fact whether it was or was not voluntary before he permits it to go to the jury. *S. v. Litteral,* 227 N.C. 527, 43 S.E. 2d 84; *S. v. Andrew,* 61 N.C. 205. In making this preliminary inquiry, the judge should afford both the prosecution and the defense a reasonable opportunity to present evidence in the absence of the jury showing the circumstances under which the confession was made. *S. v. Gibson,* 216 N.C. 535, 5 S.E. 2d 717; *S. v. Alston,* 215 N.C. 713, 3 S.E. 2d 11; *S. v. Smith,* 213 N.C. 299, 195 S.E. 819; *S. v. Blake,* 198 N.C. 547, 152 S.E. 632; *S. v. Whitener,* 191 N.C. 659, 132 S.E. 603. The admissibility of a confession is to be determined by the facts appearing in evidence when it is received or rejected, and not by the facts appearing in evidence at a later stage of the trial. *S. v. Richardson,* 216 N.C. 304, 4 S.E. 2d 852; *S. v. Alston, supra.* When the trial court finds upon a consideration of all the testimony offered on the preliminary inquiry that the confession was voluntarily made, his finding is not subject to review, if it is supported by any competent evidence. *S. v. Hairston,* 222 N.C. 455, 23 S.E. 2d 885; *S. v. Manning,* 221 N.C. 70, 18 S.E. 2d 821; *S. v. Alston, supra.* A confession is not rendered incompetent by the mere fact that the accused was under arrest or in jail or in the presence of armed officers at the time it was made. *S. v. Litteral, supra; S. v. Bennett,* 226 N.C. 82, 36 S.E. 2d 708; *S. v. Thompson,* 224 N.C. 661, 32 S.E. 2d 24; *S. v. Wagstaff,* 219 N.C. 15, 12 S.E. 2d 657.

The record discloses that the trial judge made due preliminary inquiry into the voluntariness of the confessions allegedly made by the prisoner. After hearing the State's witnesses, Sheriff Lockerman and Deputy Sheriff Weeks, who testified to specific facts pointing to the single conclusion that the prisoner made the confessions of his own volition, the trial court expressly extended to the prisoner the opportunity to present evidence showing that the confessions were not voluntary on his part, and was expressly informed by counsel for the prisoner that the prisoner did not have any testimony to offer upon the preliminary inquiry then in

progress. The trial judge thereupon found that the confessions were voluntary, and adjudged that they were admissible in evidence. This ruling cannot be disturbed on this appeal because it is supported by all the facts appearing in evidence at the time of the admission of the confessions. *S. v. Alston, supra; S. v. Perry,* 212 N.C. 533, 193 S.E. 729.

This brings us to the question whether the trial judge committed error in admitting the footprint evidence given by the State's witness, James Bradshaw.

Bradshaw testified in specific detail that he had studied the science of taking and comparing the fingerprints and footprints of human beings for the purposes of identification at various schools, and had had ten years of practical experience in that work. The trial judge thereupon found, in substance, that Bradshaw was qualified to testify as an expert in fingerprinting and footprinting, and permitted him to give the following testimony over the exception of the prisoner: That the Kornegay store was locked up from the time of the discovery of the body of the deceased until the morning of 16 June, 1950, when he and others entered and inspected the building; that he found a newspaper, to wit, the *Sampson Independent,* dated at Clinton, North Carolina, on 15 June, 1950, lying beside a puddle of blood on the floor of the store; that he observed the imprint of a bare foot on the exposed front page of the newspaper, and made enlarged photographs of it; that six days later he took the print of the corresponding bare foot of the prisoner, made enlarged photographs of it, and by that means compared the footprint on the newspaper with that of the prisoner; and that the friction ridges on the two footprints were identical. The enlarged photographs of the footprints were received in evidence over the exception of the prisoner for the limited purpose of enabling the witness to explain or illustrate to the jury his testimony as to the characteristics of the footprints.

Diligent search has failed to uncover a single decision in any jurisdiction involving the admissibility of this precise type of footprint evidence. It is a matter of common knowledge, however, in the fields of crime detection and medical jurisprudence that the permanence of the friction ridges on the sole of the foot makes a naked footprint a means of identification. See these publications: O'Hara and Osterburg: An Introduction To Criminalistics, pages 112-114; and Herzog: Medical Jurisprudence, Section 244. Moreover, Bradshaw testified with positiveness that the friction ridges on the soles of the feet of human beings are as individual and permanent as those on their fingers, and that the technique used in identifying naked footprints is the same as that employed in identifying fingerprints.

As a consequence, the action of the trial judge in admitting the footprint evidence given by Bradshaw is sanctioned by this well settled rule

of evidence: That proof of fingerprints corresponding to those of the accused found in the place where the crime was committed, under such circumstances that they could only have been impressed at the time when the crime was perpetrated, is receivable in evidence to identify the accused as the person who committed the crime charged. *S. v. Helms,* 218 N.C. 592, 12 S.E. 2d 243; *S. v. Huffman,* 209 N.C. 10, 182 S.E. 705; *S. v. Combs,* 200 N.C. 671, 158 S.E. 252; *Moon v. State,* 22 Ariz. 418, 198 P. 288, 16 A.L.R. 362.

We have not overlooked the contention of the defense that the footprint evidence ought to have been excluded without regard to its probative value because of the circumstances under which the prisoner's footprint was obtained by the prosecution. This contention is as follows: The prisoner was forced to submit to the taking of his footprint. Consequently, the introduction of evidence of its correspondence with the footprint found at the scene of the crime violated Section 11 of Article I of the Constitution of North Carolina, which provides that the accused in a criminal case cannot be compelled to give evidence against himself.

This contention is untenable for the very simple reason that its underlying premise, *i.e.,* that the prisoner's footprint was procured by compulsion, has no factual foundation. The prisoner voluntarily suffered his footprint to be taken, and for that reason cannot complain of the admission of the footprint evidence on the ground now assigned. *S. v. Cash,* 219 N.C. 818, 15 S.E. 2d 277; *S. v. Eccles,* 205 N.C. 825, 172 S.E. 415; *Garcia v. State,* 26 Ariz., 597, 229 P. 103; *Moon v. State,* 22 Ariz. 418, 198 P. 288, 16 A.L.R. 362; *Stale v. Watson,* 114 Vt. 543, 49 A. 2d 174; *State v. Johnson,* 111 W. Va. 653, 164 S.E. 31.

But the prisoner's standing would not be bettered a whit if the record did in fact disclose that he had furnished his footprint to the State under compulsion. The point in principle is decided against the prisoner in the following North Carolina cases: (1) *S. v. Riddle,* 205 N.C. 591, 172 S.E. 400, where it was held that the constitutional guarantee that the accused shall not be compelled to testify against himself does not preclude testimony by a witness as to marks on the accused's body tending to identify him as the perpetrator of the crime; (2) *S. v. Graham,* 74 N.C. 646, 21 Am. Rep. 493, and *S. v. Thompson,* 161 N.C. 238, 76 S.E. 249, where it was decided that no violation of the constitutional privilege against self-incrimination was involved in the admission of the testimony of an officer, who had the accused in custody, that he made the accused put his foot in tracks found at the scene of the crime, and that his foot fitted such tracks; and (3) *S. v. Garrett,* 71 N.C. 85, where it was adjudged that the constitutional inhibition against self-incrimination was not infringed by the receipt of the evidence of witnesses as to the condition of the accused's hand at the time of the holding of the coroner's inquest,

although the accused was then compelled to exhibit her hand to the witnesses by the coroner against her will. These North Carolina cases are in accord with well considered decisions in other jurisdictions to the effect that the constitutional privilege against self-incrimination is not violated by the introduction of evidence of fingerprints to identify the accused, even where the fingerprints of the accused are obtained by coercion. *Shannon v. State,* 207 Ark. 658, 182 S.W. 2d 384; *People v. Jones,* 112 Cal. App. 68, 296 P. 317; *Bartlette v. McFeeley,* 107 N. J. Eq. 141, 152 A. 17; *Conners v. State,* 134 Tex. Cr. 278, 115 S.W. 2d 681; *McGarry v. State,* 82 Tex. Cr. 597, 200 S.W. 527; *Owens v. Commonwealth,* 186 Va. 689, 43 S.E. 2d 895.

Simon Greenleaf, a master of the law of evidence, explained the reason supporting these and like holdings in substantially these words: The scope of the privilege against self-incrimination, in history and in principle, includes only the process of testifying by word of mouth or in writing, *i.e.,* the process of disclosure by utterance. It has no application to such physical, evidential circumstances as may exist on the accused's body or about his person. Greenleaf on Evidence (16th Ed.), section 469e. See, also, in this connection: *S. v. Cash, supra; S. v. Riddle, supra;* Wigmore on Evidence (3rd Ed.), section 2265.

Although judicial utterances often commingle and confuse the two exclusionary rules, there is a basic distinction between the rule rejecting involuntary confessions and that excluding statements inhibited by the constitutional privilege against self-incrimination. An involuntary confession is "made under circumstances that would reasonably lead the person charged to believe that it would be better to confess himself guilty of a crime he had not committed." *S. v. Grier, supra.* For this reason, the law deems involuntary confessions to be testimonially unreliable, and rejects them because they are likely to be false. *S. v. Patrick,* 48 N.C. 443. The constitutional privilege against self-incrimination, however, bars the introduction of all statements falling within its scope without regard for their truth or falsity. *People v. Fox,* 319 Ill. 606, 150 N.E. 347.

This being so, the footprint evidence in the instant case cannot be likened to an involuntary confession for reasons similar to those invoked by a New York court in sustaining a statute which provided, among other things, that no person convicted of specified crimes should be sentenced until fingerprint records were searched "with reference to the particular defendant," for the purpose of ascertaining whether or not there had been a prior conviction. "No volition—that is, no act of willing—on the part of the mind of the defendant is required. Fingerprints of an unconscious person, or even of a dead person are as accurate as are those of the living . . . By the requirement that the defendant's fingerprints be

taken there is no danger that the defendant will be required to give false testimony. The witness does not testify. The physical facts speak for themselves; no fears, no hopes, no will of the prisoner to falsify or to exaggerate could produce or create a resemblance of her fingerprints or change them in one line, and therefore there is no danger of error being committed or untruth told." *People v. Sallow,* 100 Misc. 447, 165 N.Y.S. 915. See, also, Inbau: Self-Incrimination, pages 32-41.

When this case was heard in this Court, the prisoner moved in arrest of judgment on the supposition that the grand jury which indicted him had not been sworn. This motion is disallowed because the record proper reveals that the requisite oath was administered to all the grand jurors.

As the trial judge did not commit error in any matter of law or legal inference, the proceedings had in the court below must be upheld.

No error.