STATE OF NORTH CAROLINA v. JOSIAH BISHOP, #1359 & 1360
AND
STATE OF NORTH CAROLINA v. RAYMOND L. BASKIN, #1361 & 1362
AND
STATE OF NORTH CAROLINA v. LESTER THOMPSON, #1363 & 1364
AND
STATE OF NORTH CAROLINA v. MacARTHUR McCAIN, #1365 & 1366.

(Filed 12 January, 1968.)

1. **Criminal Law § 75—**
   The test of the admissibility of a confession is whether the statements made by the defendant were in fact voluntarily and understandingly made.

2. **Same—**
   That the defendant was in the custody of police officers at the time of making the confession is but a circumstance to be considered in determining the voluntariness of the confession and does not of itself render the confession incompetent.

3. **Criminal Law § 76—**
   Upon challenge of the competency of a confession, the trial judge should excuse the jury, hear the evidence of the State and the defendant upon the question of whether defendant voluntarily and under-

STATE *v.* BISHOP; STATE *v.* BASKIN; STATE *v.* THOMPSON; STATE *v.* McCAIN.

standingly made the confession, and then make findings of fact, if the evidence be conflicting, to show the basis of his ruling in admitting the confession, and the court's findings which are supported by evidence are conclusive, but its conclusion of law from the facts found is reviewable.

**4. Same—**

The admissibility of a confession is to be determined by the facts appearing in evidence when it is received or rejected, and not by the facts appearing in evidence at a later stage of the trial.

**5. Criminal Law § 75—**

It has been the rule in this State for over 140 years that a confession obtained by the slightest emotions of hope or fear ought to be rejected.

**6. Same—**

The decision in *Miranda v. Arizona*, 384 U.S. 436, requires that a suspect in the custody of police officers must be warned, prior to interrogation, (1) that he has the right to remain silent, (2) that any statement made by him may be used as evidence against him in court, (3) that he has the right to counsel prior to and during the interrogation, and (4) that, if indigent, counsel will be appointed for him if he so desires.

**7. Same—   Confessions of defendants held voluntary and competent.**

The evidence on the *voir dire* was to the effect that the defendants were informed of their rights under *Miranda v. Arizona* prior to interrogation on their first day in custody, that they did not make any statements at that time, with one defendant expressly declining to talk until he consulted a lawyer, that the defendants were not pressed for further statements that day, and that on the following day, after again being informed of their rights, they made inculpatory statements to the police officers. *Held:* The fact that the defendants declined to make any statements at their first interrogation does not render incompetent any subsequent statements made to police officers, it affirmatively appearing that the defendants were adequately advised of their constitutional rights at each interrogation, and that their statements were in fact freely made.

**8. Criminal Law § 103—**

Where police officers testify that the defendants made inculpatory statements to them, and the defendants deny the making of such statements, whether defendants made the statements and the weight, if any, to be given to such statements are solely for the determination of the jury

**9. Searches and Seizures § 1—**

Where the person in possession and control of an automobile voluntarily consents to the search of the vehicle, he cannot thereafter object to the admission of incriminating articles found therein.

**10. Same—**

Evidence in this case *held* sufficient to show a free and intelligent consent to the search of an automobile.

**11. Criminal Law § 106—**

The extra-judicial confession of guilt by a defendant must be supported by evidence *aliunde* the confession which establishes the *corpus delicti*, and such evidence may be circumstantial or direct.

**12. Burglary and Unlawful Breakings § 5;   Larceny § 7—**

Evidence that a storehouse had been broken into, that a stolen truck was backed up to the entrance of the building, that the defendants were located in the nighttime a short distance from the building in an automobile, and that a search of the automobile revealed a wire cutter, a pistol, and a pair of wet shoes which fitted tracks along a ditchbank near the storehouse, *held* sufficient, when taken together with the confessions of the defendants, to go to the jury on the issue of defendants' guilt of larceny and of breaking and entering a storehouse.

APPEAL by defendants from *Cowper, J.,* March 1967 Criminal Session of NASH.

Defendants were tried under indictments charging larceny and receiving and breaking and entering.

The pertinent evidence offered in behalf of the State may be summarized as follows:

W. W. "Brownie" Pitt testified that he engaged in the business of renting trucks, trailers and cars at 301 W. Thomas Street in Rocky Mount, N. C. He rented GMC vans under agreement with Nationwide and Move, Inc. On 16 February 1967, a truck described as a 1965 green, 18-foot, 2-ton GMC, with "Move, Inc." and "18-B-126" on the side of the truck and valued at $6,000.00, was taken from the above location. Pitt did not rent the truck to defendants, nor did he give them permission to use it.

Floyd Smiley testified that he worked at a storeroom, located at 106 E. Grand Street in Rocky Mount, as a storekeeper for the City of Rocky Mount. On 16 February 1967, 10,000 pounds of copper wire, valued at 60¢ per pound, and various other supplies were stored in that building. He said that he completely locked the building when he left at 5:00 P.M. that day. About 10:00 P.M. that night he was notified of a break-in, whereupon he went back to examine the storeroom. He found that one of the doors had been pried open and two doors, leading to the main storeroom where the wire and other supplies were stored, were open. He observed that some flashlights were missing at that time.

Carl W. Bateman testified that he saw an enclosed van truck backed up to the open, sliding door of the storeroom between 9:30 and 10:00 P.M. that night. He radioed the police department and requested that they check into the matter.

Police Officers Randolph Saunders and James Shearin went to the storeroom in response to a call. Saunders identified two flash-

lights, found on the seat of the GMC truck, as being the property of the City of Rocky Mount. Both officers testified that a GMC truck was backed up to a door of the storehouse. Inside the open door were several rolls of copper wire.

Police Officer W. E. Patterson testified that he received a call to go to the storehouse. After searching the storehouse, he started patroling the area. He observed a white Thunderbird automobile about two blocks from the storehouse and followed the car a distance before stopping it and talking to the three occupants. Defendant McCain was driving the car and, upon request, produced a valid drivers license, but no registration card. When questioned about being in the vicinity, McCain stated he was looking for a place by the name of "Tosa." Neither Patterson nor Officer Edwards had heard of the place, so they asked defendants to follow their car to the police station. At the police station, Patterson mentioned "Tarboro", and they said that was the place they were looking for; that they had to pick up a relative there. At this point, defendant objected, and the jury was excused from the courtroom. On *voir dire,* officer Patterson stated that he had not placed defendants under arrest, and that he did not advise McCain of his rights at that time; that he asked permission to look in the car because "they were in the vicinity of a break in." McCain gave him permission to look in the car and gave him the keys. Thereafter, the court overruled the objection and the jury was recalled to the courtroom. Patterson then testified, in the presence of the jury, that he found a wet pair of shoes under the seat of the Thunderbird and wire cutters, an automatic pistol, clothes and another pair of wet shoes in the trunk. He further stated that Josiah Bishop was then taken into another room where he was advised of his rights. Bishop did not ask for an attorney. The following question was then asked: "After you advised him of these various matters, did he make any statement?" Upon objection, the jury was excused from the courtroom. Patterson, on *voir dire,* testified as follows:

"I advised the defendant Bishop, 'You have the right to remain silent. Anything you say can be used against you in court. You have the right to the presence of a lawyer. If you cannot afford a lawyer one will be appointed for you before any questioning, if you so desire. If at any time before or during questioning you wish to remain silent you may do so. After hearing your rights, do you understand you do not have to talk or answer any questions asked you and if you do answer any questions asked you and if you do it can and will be used against you in court.' "

The court found as a fact that the statements made by Bishop to Officer Patterson were voluntarily made after he had been warned of his constitutional rights. The jury was recalled to the courtroom. Patterson then testified that Bishop told him the shoes were damp because he had gone into the woods. Patterson did not question the other two defendants who were picked up that night.

Police Officer Tom Moore testified that he was working at the desk at the police station on the night in question; that Raymond Baskin came into the station about 11:30 P.M. and inquired about the Thunderbird sitting outside the station, stating he was the owner of the car. Another man came to the station with him. Shortly thereafter, Baskin hurriedly left the station. Officer Joseph Brown testified that he saw Baskin leave the station and begin running when he reached the sidewalk, and that Sgt. Hoell came running out behind Baskin. Brown and Hoell gave chase and overtook Baskin about one and a half blocks from the police station.

Detective Horace Winstead testified that he met the four defendants on the morning of Friday, 17 February 1967, at the police station, where they were in jail. He took Bishop out of jail and into an office where he advised him of his rights. Bishop signed a paper acknowledging that he understood the warning. Winstead told Bishop that he wanted to discuss the break-in and the larceny of a truck. At this point the jury was excused from the courtroom. On *voir dire*, Winstead testified that he had talked to all four defendants, warning them of their rights beforehand. The warning, given individually to each of the four defendants, was as follows:

> "You have the right to remain silent. Anything you say can be used against you in court. You have a right to the presence of a lawyer. If you cannot afford a lawyer one will be appointed for you, before any questioning, if you so desire. If at any time before or during questioning you wish to remain silent you may do so. After hearing your rights do you understand you do not have to talk or answer any questions asked you, and if you do it can and will be used against you in court."

Winstead stated he did not threaten them or promise them hope of reward or leniency. He testified that he talked to Bishop about 15 minutes and Bishop said that before he made any further statement he would like to talk to a lawyer. Winstead replied, "That's fine, I'll put you right back in jail until we can get you a lawyer." He also testified that in separate conversations with Thompson, McCain and Baskin, each stated that he did not have anything to say, so questioning was postponed and they were returned to jail.

288                    IN THE SUPREME COURT.                    [272

STATE *v*. BISHOP; STATE *v*. BASKIN; STATE *v*. THOMPSON; STATE *v*. McCAIN.

He said he talked to each of these three defendants for a period of about five minutes.

The court found as a fact that all four defendants were warned of their constitutional rights prior to making any statement and that such statements as were made, were made voluntarily. The jury was recalled. Winstead then testified in the presence of the jury that Bishop told him he knew nothing of the break-in.

Winstead testified that he thereafter took McCain's shoes to a ditch located about 100 feet from the storeroom. There was water, sand and oil in the ditch and the same three elements were on the shoes. There were tracks in the sand, in which Winstead placed the shoes. The shoes were exactly the same size as the tracks. The tracks led down to and through a culvert under the railroad. Winstead returned to the station and talked to McCain with reference to the tracks and his shoes. McCain responded by refusing to say anything about the shoes and stating he did not want to make any further statement. Winstead then put him back in jail. Subsequently, Winstead talked to Thompson and Baskin individually, and each defendant stated that he did not wish to make a statement, after which they were placed back in jail. Officer Winstead then testified that on the next day, in the presence of Lt. Moore and Detective Luper, each defendant separately and in the presence of each other made statements; that before they made statements, they were each again warned of their constitutional rights in the same manner as on the day before. The statements made by the defendants were, in substance, as follows:

Bishop: That he had been the "look out" man and had stood on the railroad tracks; that his job was to "holler out Police," which he did when he saw a car approaching, and then ran.

McCain: That he was the driver of the Thunderbird; that they rode by the city storeroom "and figured there ought to be some wire in there." He went in the back door of the storeroom and when in the main part of the storeroom saw the copper wire. He and Baskin then drove over to Brownie Pitt's service station.

Baskin: He and McCain entered the storeroom where he observed the wire. They then went to the service station, where he took the switch out, fastened the wires together in the truck and drove it back to the city lot. He stated to the others that they were to get the wire and that he would walk on ahead because he had a bad ankle and was afraid that the police would catch him. The next time he saw the others was when he observed his car in front of the police station and went inside to inquire about it. While in the police station, he decided that he should leave, which he did, but was easily caught.

Thompson: During a casual conversation between Thompson and the law enforcement officers, Thompson stated that if they had any questions to ask, to do so, and that he would tell them what they wanted to know. He then stated that he was supposed to have been a "look out" man with Bishop on the railroad tracks, but ran when Bishop shouted that the police were coming.

Then Winstead, Lt. Moore, and Officer Luper talked to all the defendants together. Winstead testified that all the defendants agreed that they went to the storeroom for the purpose of stealing copper wire; that McCain went back to the lot when he heard someone shout "police", whereupon he ran down a ditch and through the culvert. Three defendants got back to the car and were riding around looking for Baskin when the police stopped them. None of the defendants signed written statements. Winstead stated that the defendants talked freely and that he made no promises to them. Warrants were issued for defendants on 18 February 1967 at the request of Winstead, on information and belief. On cross-examination, Winstead testified that Bishop was the first to make a statement. Bishop had previously talked to a lawyer, but the lawyer was not present nor did Bishop request his presence at the time the statement was made.

The testimony of detective W. O. Moore tended to corroborate the testimony previously given by detective Horace Winstead.

The State then rested.

Mamie Tyson Staton, testifying for defendants, stated that Baskin had brought her from Washington, D. C., to Tarboro, N. C., a week before her father died and then came to pick her up and take her back to Washington. Concerning the events occurring on Thursday, 16 February 1967, she stated that McCain and Thompson left Tarboro about 7:45 P.M. to take a girl to the bus terminal. Around 10:00 P.M. she left Baskin asleep at her mother's house in Tarboro and went to her brother's house. There she took a telephone call for Baskin. She was told that the police had Baskin's car in Rocky Mount. When she informed Baskin of the telephone conversation, he persuaded someone to take him to Rocky Mount to check on his car. Baskin left Tarboro shortly after 10:00 P.M.

Defendant Raymond Baskin testified that he, Bishop, Thompson and McCain came to North Carolina in his 1961 Thunderbird for the purpose of taking Mamie Staton back to Washington, D. C. They first arrived in Tarboro and stayed there about ten minutes. From Tarboro they went to Durham, where they stayed overnight in the Jack Tar Hotel. From Durham they returned to Tarboro. About 5:30 P.M. McCain, Thompson and Bishop carried three women to the bus station in Raleigh. Baskin stayed with Mamie

Staton in Tarboro. Baskin next saw the other three defendants at the police station in Rocky Mount. Baskin went to the police station because McCain, Thompson and Bishop had not returned. He called a friend in Durham who informed him that McCain had called and wanted Baskin to come to Rocky Mount to identify the car. At the police station, Baskin stated that he was told he was going to be charged with carrying a concealed weapon. Baskin then walked out of the police station. He was brought back to the station, where he stayed until the following Tuesday. Baskin stated that he did not tell the officers he was involved in the break-in or that he stole a truck.

Defendants Bishop, McCain and Thompson, testifying individually, stated in substance as follows:

They left Washington, D. C. for North Carolina with Baskin, in the latter's Thunderbird, for the purpose of transporting Mamie Staton back to Washington. On arrival in Tarboro, N. C., they stayed about 15 minutes and then left for Durham, where they stayed overnight. Thursday, they returned to Tarboro. Bishop, McCain and Thompson left Baskin at Mamie Staton's house and returned to Durham. That same evening, as they were returning to Tarboro from Durham, because of their unfamiliarity with the road they became lost in Rocky Mount. Two officers stopped them and, upon request, McCain produced his drivers license. When asked about their presence in the vicinity, they explained to the officers that they were looking for a town by the name of "Tobie." The officers did not know of such a town and asked them to follow their car to the police station. At the station the officers mentioned "Tarboro" and defendants agreed that was the town they were looking for. One of the officers asked McCain for the keys to the car, and he gave them to the officer. McCain was informed that he was going to be arrested for having a stolen vehicle unless he could get the owner to identify the car. Upon request, McCain was permitted to make two telephone calls in an attempt to locate Baskin.

All three defendants testified that they knew nothing of the break-in and stolen truck and that they did not tell the police officers anything.

In addition, Bishop testified that when he refused to sign a statement, one of the detectives "took the flashlight and put a knot on my head," and, instead of placing him back in jail with Thompson and McCain, had taken him to the Nashville jail. He further testified he was told that if he would sign the statement, his bond would be reduced and that there would be a possibility of a lesser sentence. Conversely, Baskin testified that he had made three or four tele-

phone calls and that "The police department was right nice to me. They treated me all right; they gave me all these charges."

All defendants were found guilty of breaking and entering and larceny, and from judgments entered, all defendants appealed.

*Attorney General Bruton and Assistant Attorney General Bernard A. Harrell for the State.*
*W. O. Rosser and Alfred S. Bryant for defendants.*

BRANCH, J. The principal contention of defendants is that the court erred in admitting into evidence the confessions of defendants.

The test of admissibility is whether the statements made by defendants were in fact voluntarily and understandingly made. *State v. Gray*, 268 N.C. 69, 150 S.E. 2d 1; *State v. Rogers*, 233 N.C. 390, 64 S.E. 2d 572; *State v. Roberts*, 12 N.C. 259. Although the fact that the defendant was in custody is a circumstance to be considered when considering the voluntariness of a confession, *State v. Guffey*, 261 N.C. 322, 134 S.E. 2d 619, this fact does not of itself render it incompetent. *State v. Barnes*, 264 N.C. 517, 142 S.E. 2d 344.

When a confession of a defendant is offered into evidence, and the defendant objects, the trial judge should then excuse the jury and in the absence of the jury hear the evidence of both the State and defendant upon the question of whether defendant, if he made an admission or confession, voluntarily and understandingly made the admission or confession. *State v. Rogers, supra; State v. Gray, supra; State v. Conyers*, 267 N.C. 618, 148 S.E. 2d 569.

The general rule is that after such inquiry the trial judge shall make findings of fact to show the basis of his ruling on the admissibility of the evidence offered, and that the facts so found are conclusive on the appellate courts when supported by competent evidence. Nevertheless, the conclusions of law drawn from the facts found are not binding on the appellate courts. *State v. Hines*, 266 N.C. 1, 145 S.E. 2d 363; *State v. Walker*, 266 N.C. 269, 145 S.E. 2d 833; *State v. Conyers, supra*. However, in the case of *State v. Keith*, 266 N.C. 263, 145 S.E. 2d 841, where the defendant contended that he had made no confession, the court recognized that there is no necessity for findings of fact where there is no conflicting testimony offered on the *voir dire*.

In the case of *State v. Conyers, supra*, the trial judge held a preliminary *voir dire* as to the voluntariness of the defendant's alleged confession, and at the conclusion of the *voir dire* entered into the record a statement finding defendant's statement to have been made "freely and voluntarily" . . . The Court, citing *State v.*

*Barnes, supra,* held the court's declaration to be a statement of its conclusion and improperly entered. In this case there was testimony by the defendant which presented a sharp conflict in the evidence upon the *voir dire.* The holding in *Keith* was recognized and distinguished in *Conyers* on the basis that no conflicting testimony was offered.

Here, the trial judge, upon objection, properly excused the jury and in the absence of the jury conducted a *voir dire* hearing. The court gave both the State and defendants opportunity to offer evidence. The State offered evidence, and defendants chose to offer none. The trial court's finding that defendants were duly warned of their constitutional rights prior to making any statement is supported by competent evidence, and this Court is bound by this finding.

In order to consider fully defendants' contention that the court erred in admitting the statements made by defendants, we must review the court's conclusion that such statements as were made were made voluntarily.

The admissibility of this evidence is to be determined by the facts appearing in evidence when it is received or rejected, and not by the facts appearing in the evidence at a later stage of the trial. *State v. Rogers, supra.*

The rules of law which we have considered to this point have been rules of law laid down by the North Carolina Supreme Court. It is with pardonable pride that we note that for over one hundred forty years the rule enunciated in *State v. Roberts, supra* that "a confession obtained by the slightest emotions of hope or fear ought to be rejected" has been an approved and applied rule of this Court. Thus, the rationale of *Miranda v. Arizona,* 384 U.S. 436, is not new with us, but the broad and far-reaching language, which we must acknowledge as binding on us, has had such a massive impact upon criminal jurisprudence and law enforcement that we must construe and apply its language to the facts of the instant case.

The case of *Miranda v. Arizona, supra,* erects certain safeguards as to the question of "in-custody" suspects which require, in effect, that the suspect be warned: (1) that he has the right to remain silent, (2) that any statement he does make may be used as evidence against him in court, (3) that he has the right to counsel, either appointed or retained, prior to and during the interrogation, and (4) that if he is indigent, counsel will be appointed for him prior to any questioning, if he so desires.

The most compelling argument offered by defendants is based on that portion of the *Miranda* opinion which states:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked."

In considering this argument, the pertinent excerpts from the *voir dire,* taken in the absence of the jury, are as follows:

"COUNSEL FOR DEFENDANT REQUESTS THAT HE BE ALLOWED TO QUESTION THE WITNESS IN THE ABSENCE OF THE JURY.

AT THIS POINT THE JURY WAS EXCUSED FROM THE COURTROOM AND THE FOLLOWING PROCEEDINGS HAD IN THE ABSENCE OF THE JURY:

Q. Did he sign any statement in your presence at that time?
A. He signed this.

Q. Did he sign any written confession?
A. No sir.

Q. Did you make any notes as to what he said?
A. No sir.

Q. Did he refuse to make any statements?
A. With reference to this, yes sir.

Q. That's all.
MR. HOLDFORD, SOLICITOR: Did you talk to Raymond Baskin also that day?
A. Yes sir.

Q. Before talking to him did you advise him of his constitutional rights?
A. Yes sir, I did.

Q. Did you use the same form?
A. Yes sir. (Warning as to constitutional rights substantially the same as quoted on page 4 of this opinion).

. . . .

Q. Did you talk to Lester Thompson?
A. Yes, I did.

Q. Before questioning him did you advise him of his rights?
A. Yes sir.

Q. Did you use the same form that the city of Rocky Mount had given you and which you have testified from before?
A. Yes sir.

Q. What did you advise him?
A. (Warning as to constitutional rights substantially the same as quoted on page 4 of this opinion).

Q. And did you talk to MacArthur McCain?
A. Yes, I did.

Q. Before talking to him did you advise him of his constitutional rights?
A. Yes sir. Lt. Richardson, the Identification officer, was present at that time.

Q. At that time did you use the form provided for you by the city of Rocky Mount Police Department?
A. Yes sir.

Q. State for the record what you advised him?
A. (Warning as to constitutional rights substantially as quoted on page 4 of this opinion).

. . . .

Q. Did either one of these four defendant . . . ask for an attorney at that time?
A. They did not. Each one of them asked to make a telephone call, except one, and right now I am not sure which one that was.

Q. The three that asked, were they allowed to make a telephone call?
A. Yes sir, they were . . .

. . . . .

Q. Did you threaten these defendants in any way to get them to make a statement?
A. No sir, I did not.

Q. Did you offer them any hope of reward to get them to make a statement?
A. No sir, I did not.

Q. Did you tell them the court would go lighter on them to get them to make a statement?
A. No sir.

. . . .

MR. ROSSER: Mr. Winstead, did either one of those four defendants make a voluntary statement at that time with reference to this matter?
A. At that time, no.

Q. They didn't have a lawyer at that time, either, did they?
A. No sir.

Q. Was a lawyer later brought in there to them, about a day later?
A. I understand he was. I don't know it for a fact.

Q. But neither one of them made a statement at that time?
A. No sir.

Q. That is all.
MR. HOLDFORD: Mr. Rosser, do you wish to put on any evidence?
MR. ROSSER: No, sir. If they made no statement I am not hurt.
A. They later did, but not at that time.
MR. ROSSER: Mr. Winstead, will you tell for the record if you thoroughly explained those four questions to each defendant, you think they understood them, don't you?
A. I know they did.

. . . .

MR. HOLDFORD, SOLICITOR: Mr. Winstead, how much later was it that they made the statements to you?
A. Later on in the presence of Lt. Moore and Detective Luper they did make a statement in my presence. Each one of them separately and all together.

Q. How much later was that?
A. The following day, I believe.

. . . .

Q. The following day when they made a statement, before each one of them made a statement, did you or Mr. Moore again advise them of these rights which you had advised before?
A. Yes sir.

Q. Did you go through the same procedure?
A. Yes, sir."

State v. Bishop; State v. Baskin; State v. Thompson; State v. McCain.

The evidence above quoted and other evidence in the *voir dire* examination reveals that defendants were warned of their constitutional rights before being questioned the first day they were in custody, and that they did not make a statement at·that time. The record further indicates that they were not pressed for further statement at that time, and that on the following day, after again being fully warned of their constitutional rights, they then freely made inculpatory statements. It should be noted at this point that it is affirmatively shown that there were no lengthy interrogations, that counsel was offered to defendants, that they were not held incommunicado. (In fact, all defendants used the telephone, except one, and he was offered the opportunity.) The record is replete with the approved warnings, the offer of counsel, and shows no occasion on which any one of the defendants was questioned without the opportunity of having an attorney present.

We do not interpret the portion of the *Miranda* opinion now under consideration to mean that when a defendant is "in custody" and has been duly advised of his constitutional rights, and he states that he·does not want to make a statement at the first questioning, that law enforcement officers are forever barred from asking another question. We do interpret it to mean that when a defendant is being interrogated and he indicates that he wishes to remain silent, that interrogation must not then be continued. The vice sought to be removed is the evil of continued, incessant harassment by interrogation which results in breaking the will of the suspect, thereby making his statement involuntary. This interpretation of this particular facet of *Miranda* is seemingly adopted by Justice Clark when in his dissenting opinion he stated:

> "Now, the Court fashions a constitutional rule that the police may engage in no custodial interrogation without additionally advising the accused that he has a right under the Fifth Amendment to the presence of counsel during interrogation and that, if he is without funds, counsel will be furnished him. When at any point during an interrogation the accused seeks affirmatively or impliedly to invoke his rights to silence or counsel, *interrogation must be forgone or postponed.*" (Emphasis ours.)

This conclusion is borne out by the opinion itself when it discusses *in extenseo* certain practices of sustained interrogation and trickery cited in investigatory manuals as having been used by custodial officers. Justice White in his dissenting opinion refers to these procedures as follows: "But even if the relentless application of the described procedures could lead to involuntary confessions,

it most assuredly does not follow that each and every case will disclose this kind of interrogation or this kind of consequence."[2] This statement is footnoted with the following:

> "2. In fact, the type of sustained interrogation described by the Court appears to be the exception rather than the rule. A survey of 399 cases in one city found that in almost half of the cases the interrogation lasted less than 30 minutes. Barrett, Police Practices and the Law — from Arrest to Release or Charge, 50 Calif. L. Rev. 11, 41-45 (1962) Questioning tends to be confused and sporadic and is usually concentrated on confrontations with witnesses or new items of evidence, as these are obtained by officers conducting the investigation. (Citing legal publications.)"

It is to be noted that the above reference to dissenting opinions in *Miranda* is solely for the purpose of showing the interpretation that members of the Court placed on the results reached as to this particular phrase of the opinion.

We do not know what makes criminals confess. Be it apprehension, a desire to rid themselves of their feeling of guilt, braggadocio, or the better side of mankind which demands that truth be spoken. All we know is that it does happen.

The present record shows that adequate safeguard procedures to protect against self-incrimination were used at the interrogation of each of the defendants. Further, the record shows that defendants' alleged statements were, in fact, freely made. Their rights under the Fifth and Fourteenth Amendments were fully protected. We hold that the trial judge correctly admitted statements of the defendants.

The defendants later testified before the jury that they never made any inculpatory statements to the officers. Whether defendants made the statements offered into evidence and the weight, if any, to be given to such statements is solely for determination by the jury. *State v. Walker, supra.*

Defendants also assign as error the admission of testimony concerning search of Baskin's automobile and the items alleged to have been found in the automobile.

Upon objection to this evidence, the court again excused the jury and held an extended *voir dire* examination. The uncontradicted evidence elicited on the *voir dire* is to the effect that officer Patterson asked the driver and person in possession of the automobile for permission to search it. The driver of the automobile, McCain, gave Patterson the keys, and the search was conducted. Further, the *voir dire* did not reveal that the defendant had been taken into custody

or significantly deprived of his freedom of action. The search was conducted in the investigatory stage rather than the accusatory stage.

In the case of *State v. Temple,* 269 N.C. 57, 152 S.E. 2d 206, the defendant's motion to suppress evidence resulting from a search of the defendant's automobile was denied when the *voir dire* evidence disclosed that the police officer told the defendant that he was a suspect in a rape case and that he was searching for a girl's panties and asked permission of the defendant to search his automobile. The defendant granted this permission, and a girl's panties were found in the automobile. The court held that the motion to suppress was properly denied for the reason the defendant voluntarily consented to the search.

"Where the person voluntarily consents to the search, he cannot be heard to complain that his constitutional and statutory rights were violated." *State v. McPeak,* 243 N.C. 243, 90 S.E. 2d 501; *State v. Hamilton,* 264 N.C. 277, 141 S.E. 2d 506; *State v. Williams,* 269 N.C. 376, 152 S.E. 2d 478.

Again, in the case of *State v. Belk, State v. Pearson and State v. Berry,* 268 N.C. 320, 150 S.E. 2d 481, where upon *voir dire,* after motion to suppress the evidence, the *voir dire* evidence tended to show that the owner and operator of an automobile in respect to officer's request that he be allowed to search, stated that he would get the key to the trunk and thereupon did obtain the key and gave it to the officer. The Court held that the consent to search rendered the evidence obtained competent and that the passengers in the automobile could not object to such evidence when the person having possession and control of the vehicle consented to the search.

In the case of *State v. Bell,* 270 N.C. 25, 153 S.E. 2d 741, the defendant objected to the admission of evidence of exhibits found in defendant's automobile. The trial court, in the absence of the jury, heard the State's evidence as to the circumstances of the search. The defendant cross-examined State's witness at length, but offered no evidence when given the opportunity to do so. This Court held that the failure of the trial judge to find facts when he overruled defendant's objection was not fatal since his ruling that the evidence was competent was necessarily based on a finding that the search was legal. See also *State v. Litteral,* 227 N.C. 527, 43 S.E. 2d 84.

Since, in the instant case, the officers who made the search had reasonable grounds to believe a felony had been committed, the search preceding the arrest and with defendants' consent, was legal. *U. S. v. Sala,* 1962 D.C. Pa., 209 F. Supp. 956.

There was sufficient evidence presented on *voir dire* to show a free and intelligent consent to the search of the vehicle and to demonstrate that defendants suffered no loss of their constitutional

rights under either the State or Federal Constitution. The trial judge properly overruled defendants' objection.

Defendants' contention that the trial judge erred in overruling their motions for judgments as of nonsuit is without merit.

The naked extra-judicial confession of guilt by a defendant must be supported by evidence *aliunde* which establishes the *corpus delecti*. The *corpus delecti* may be established by direct or circumstantial evidence. *State v. Cope,* 240 N.C. 244, 81 S.E. 2d 773; *State v. Thomas,* 241 N.C. 337, 85 S.E. 2d 300; *State v. Whittemore,* 255 N.C. 583, 122 S.E. 2d 396.

Here, theft of the truck and a breaking and entering of the storehouse was established *aliunde* the confessions. Also, the stolen truck was backed up to the door of the storehouse with the motor running when the officer arrived. Defendants were located in the nighttime a short distance from the storehouse, driving an automobile without having in their possession a registration card. When a permissive search of the automobile was made, the officer found wire cutters, a pistol, and wet shoes. One pair of the wet shoes fitted tracks found along the ditch bank near the storehouse which was broken and entered. This evidence, when taken with the confessions of defendants, is amply sufficient to repel the motions of defendants for nonsuit.

We have carefully examined defendants' other assignments of error and we find no prejudicial error which warrants a new trial.

No error.