## JERRY WILBERT SULLINS and PHILLIP LEE WHITEHEAD, Plaintiffs in Error, v. STATE OF TENNESSEE, Defendant in Error.

Court of Criminal Appeals of Tennessee. May 23, 1969.

Rehearing Denied Oct. 2, 1969, as to Whitehead.

Certiorari Denied by Supreme Court Oct. 6, 1969, as to Sullins.

Certiorari Denied by Supreme Court Dec. 1, 1969, as to Whitehead.

632

William J. Peeler, Waverly, William Landis Turner, Hohenwald, for plaintiffs in error.

George F. McCanless, Atty. Gen., Arnold Peebles, Jr., Asst. Atty. Gen., Nashville, Alonzo Bates, Dist. Atty. Gen., Centerville, D. D. Humphreys, Jr., Hohenwald, for defendant in error.

## OPINION

GALBREATH, Judge.

This is the joint appeal of two of four defendants convicted in the Criminal Court of Perry County of burglary in the third degree and the resulting sentences of not less than three (3) nor more than four (4) years.

We will consider, first, the two assignments of error relied upon by the plaintiff in error, Jerry Wilbert Sullins, in admitting his written inculpatory statement into evidence and in denying the jury's request to rehear the oral testimony after granting a like request to read again the written statement.

The State contends that the statement complained of was voluntarily given by Sullins after he was adequately warned of his constitutional rights, which were knowingly waived, and that in any event the defendant waived any objection to the introduction of the statement because he testified in his own behalf and substantially reiterated the confession while on the stand.

The defendants were indicted for burglary of a super-market in Linden. The two plaintiffs in error were also charged with possessing explosives and mistrials were granted after the jury failed to agree on a verdict in one such case involving both defendants and an acquittal was granted Whitehead in a second possession of explosives case. The only part of the statement not adopted by Sullins after he took the stand, as truth was portions of it referring to the explosives, he explaining to the jury that he falsely told the investigating officers to whom he confessed that he had possessed the dynamite in question in an effort to help another co-defendant, Ernest Lennel Hinsley, as to whom a severance was granted when he failed to appear for trial, because Hinsley had children and other family responsibilities. Sullins, in effect, made a full judicial confession to the court and jury and threw himself on the mercy of the court. In his own words he said to the court and jury after describing his part in the break-in:

"Q Have you told this Jury the truth today?

A Yes, sir, I have.

Q You have anything else you want to say to these gentlemen?

A Only that I hope that they will you know make it as light on me as they can—if I ever get out of it, I'm sorry for doing it and if I ever get out of it I'll never do it again.

Q I don't think they can hear you, I think you better say it again.

A I said I'm sorry for what I've done, if I ever get out of this I ain't getting in no more trouble."

■ The trial court conducted a full hearing outside the presence of the jury during which the interrogating officer testified that the defendant was fully advised as to his constitutional rights following which the defendant was asked if he understood and replied that he did. In addition, he was given a card on which the detailed rights outlined in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, were printed. The defendant testified that he was not familiar with some of the words printed on the card, including the word "Miranda" and that he did not remember whether he had told the T.B.I. officer, John Sloan, that he understood what was written on the card, but he did say that he understood the meaning of the warnings outlining his rights to remain silent, to have the presence of counsel appointed if necessary during questioning and the fact that a statement given would be used in court against him. In short, an examination of the whole record sustains the trial court's holding that the confession of Sullins was voluntary.

■ Then, too, by his admissions from the stand, the defendant removed any question as to the admissibility of the written statement outlining the same facts. In Owens v. State, 202 Tenn. 679, 308 S.W.2d 423, our Supreme Court adopted a statement from Sloan v. State, 158 Miss. 138, 130 So. 110, that is applicable here:

"When a case is such that the conviction is adequately sustained on the testimony of the defendant himself, as in this case, any error in order to work a reversal must be one which obviously is obnoxious to the indispensable fundamentals of criminal procedure; and there is no such error in this record."

■ We find no error in the jury not being afforded an opportunity to listen to a playback of the defendant's testimony while being allowed to read again the written confession. It is conceded by the defendant that there were "certain practical problems" described in the record that make it difficult to let the jurors hear the recording. As the court reporter put it, "I doubt if they could hear it." The machine needed to properly play the recording was, it appears from the record, in Columbia.

It seems that the main objection to allowing the jurors access to the written statement was that it contained the aforementioned references to the possession of dynamite and it was feared this would prejudice the jurors since Sullins had repudiated that portion of the statement. Inasmuch as the jury failed to convict the defendant for the possession of explosives, it is clear that no such prejudice resulted. And, as pointed out before, the defendant's testimony from the witness stand waived any objection to the submission of the parts of the written statement corroborated by such testimony.

It results that the defendant Sullins' assignments of error are overruled.

Turning now to the assignments of error presented on behalf of the defendant Whitehead. They addressed themselves to (1) the sufficiency of the evidence; (2) the overruling of a plea in abatement challenging the composition of the Grand Jury; (3) the admission of an inculpatory statement obtained from the defendant; (4) the restriction of voir dire examination of the jury; and (5) a denial of adequate time to allow the court reporter

to prepare a copy of the transcript prior to disposition of the pending motion for a new trial.

■ This court cannot consider the purported plea in abatement since it is not part of the authenticated record. It is axiomatic that we cannot take cognizance of that which is not before us.

■ The same fatal omission will not allow us to pass on the question presented in connection with the voir dire of the jury as the portion of the proceedings encompassed in qualifying the jurors was not preserved in the bill of exceptions. While the bill of exceptions notes that a jury was selected to try the case, there is no record of any objection on the part of the defendant to the manner in which the jury was selected. In the absence of such objection it is presumed the jury is properly qualified and acceptable to the parties. "When the record shows that the jurors were 'elected, impaneled, tried and sworn,' it is presumed they were fair and impartial jurors since the Trial Judge has the exclusive right to pass upon the selection of jurors." Long v. State, 187 Tenn. 139, 213 S.W.2d 37.

■ Too, there is nothing in the record to sustain the assignment as to the failure of the court to allow sufficient time before the hearing on the motion for a new trial to allow the court reporter to transcribe the testimony. No application for a continuance appears in either the technical record or the bill of exceptions. There is no indication in the scholarly brief filed on behalf of the defendant that any point to be relied on was overlooked by the failure to have the verbatim transcript in the hands of counsel at the time the motion for a new

trial was argued and overruled. If the failure to have the record available caused any harm to the defendant, it is not specifically pointed out to us. Thus, it does not "affirmatively appear that an indigent defendant has been deprived of an appellate review of his case on the merits by reason of delay or nonaction on the part of state agencies" as discussed in Nelms v. State, 219 Tenn. 727, 413 S.W.2d 378. Such error, if any, therefore, would be harmless. Too, the defendant was not an indigent.

■ There being ample evidence in the record to sustain the conviction of Whitehead if his confession was admissible in evidence it comes down to the sole question of whether the statement was freely and voluntarily given after a knowledgeable waiver of understood rights against self-incrimination and to counsel as guaranteed by the Federal and State Constitutions spelled out in such decisions as Miranda v. Arizona, *supra.*

The defendant had learned of the arrest of his friends by the sheriff of Perry County, who apprehended one of them, Ernest Lennell Hinsley, at the scene of the breakin and the others the following morning in Nashville. He telephoned the sheriff and on Friday, following the breakin on Monday, February 15, 1968, he came to Linden, accompanied by his wife, mother-in-law, his brother-in-law and his own sister. He had never been arrested before. One of the first things the defendant inquired about, and certainly before any interrogation, was the availability of a lawyer. He was advised that the nearest lawyer was in Hohenwald and his brother-in-law undertook to locate legal assistance. Prior to an attorney being located and made available, interrogation was undertaken by Agent John Sloan of the T.B.I. and

Fire Marshal Ola Duck, who was interested in the case it would appear because of the dynamite involved. The defendant was given a card to read, on one side of which the Miranda warnings were printed, the other side containing instructions to the officer to secure an affirmative reply to the following two questions: (1) Do you understand each of these rights I have explained to you? (2) Having these rights in mind do you want to talk to us now?

There is some confusion in the record as to whether the defendant merely read the warnings or whether they were read to him. Agent Sloan stated he did not remember but that he always read the warnings to defendants who could not read. Fire Marshal Duck says he recalls that the warnings were read but that the questions on the other side of the card pertaining to the waiver of the rights were not read to the defendant. The defendant testified that he was simply handed the card and that although he understood some of the words printed on it, he didn't understand others, such as the meaning of "affirmative." He did say he understood from reading the card that he was entitled to a lawyer and that he requested one. Both the defendant and Agent Sloan agree that the defendant did state after the investigation started that he wanted a lawyer and that he didn't want to answer any other questions until he had a lawyer. Upon this assertion by the defendant, Agent Sloan ceased his interrogation.

Shortly after the abortive attempt to question the defendant and without any effort on the part of anyone except his brother-in-law to obtain for him the legal counsel he had requested, the defendant was taken from

Linden to Decaturville by the sheriff of Perry County. This was done to keep this defendant separated from the co-defendants who had already confessed so that there would be no opportunity for collusion between them.

The defendant testified that he was frightened of the prospects of being put in the jail at Decaturville and of what might be done to him there. He said that Marshal Duck, who lived in Decaturville, had particularly impressed him by "rolling his sleeves up and talking about wrestling, talking about how bad a shark he used to be, and all that." It appears that the defendant had the impression that Marshal Duck had sometime in the past wrestled a bear or an ape. In any event, the thought of going to the Decaturville jail instead of being housed in Linden at the jail there was so objectionable to the defendant that the defendant offered to give a statement if he could be assured he would not be put in the Decaturville jail. He also said he was frightened of not only Mr. Duck, but the sheriff and another gentleman named Gus Steele, a sergeant with the Tennessee Highway Patrol, who drove the defendant and Sheriff Dodson to Decaturville sometime after dark.

After arriving in Decaturville, the defendant and his escort were met by Fire Marshal Duck who suggested that they go to his daughter's nearby home, where, after the Miranda warnings were repeated, a statement was obtained from the defendant.

■ ■ From a careful reading of the record, there does not appear to have been any reasonable basis for the trepidation on the part of the defendant as to the treatment he would be subjected to at the Decaturville jail.

It appears that any such misgivings he did have on that score were engendered, not by his interrogators, but by other prisoners at the Linden jail who had convinced him that he might be in for rough treatment in the Decatur County jail. *Miranda,* as we presently understand it, seeks to prevent the oppressive, intimidative type incustodial interrogations in which agents of the prosecution mistreat a subject. It has not, to our knowledge, been extended to cover instances in which those other than the police give rise to such a state of fear that the defendant is induced to confess what he would otherwise keep secret. In such a case careful scrutiny should be given the facts to rule out the probability of such persuasion being police originated, and in the instant case, this has been done. Nothing in the record suggests that either the sheriff, the fire marshal, the T.B.I. agent, or the highway patrolman had anything at all to do with the origin of the reports as to the treatment allegedly visited by the authorities on the inmates of the jail to which the defendant was being removed for a legitimate purpose.

In a Texas case called to our attention, the accused informed the police that he wanted an attorney but before he could secure the services of one, he, on his own, decided that in his words, "Man, you all ready got me on it any how, I might as well tell you all about it and get this stuff all straightened up." Thereafter, as he had been before, he was advised of his Miranda rights and gave a written confession. In ruling the statement admissible, over his objections, the Texas Court of Criminal Appeals set out fully, and we believe correctly, the reasoning that should guide us in this case:

"It appears to be the appellant's contention that despite the proper warnings and waiver or other circumstances the police officers were forever barred from future interrogation after appellant's statement that he was attempting to acquire an attorney. We do not agree.

*"Miranda,* of course, teaches that even though an accused has been warned and has waived his rights, he may terminate the custodial interrogation at any point and reassert his privilege against self incrimination and his right to counsel.

"The Court in *Miranda* said:

" 'Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.'

"We do not interpret that portion of *Miranda* to mean that under no circumstances can there ever be any further interrogation, particularly where the prosecution has sustained its heavy burden of demonstrating that the accused knowingly and intelligently waived his privilege against self incrimination and his right to retained and appointed counsel. Only recently this Court in Gunter v. State, 421 S.W.2d 657, held admissible, under the circumstances there presented, a confession taken in absence of and without notification of accused's court appointed counsel, in view of the clear cut affirmative waiver. See also Childs v. State, 243 Ark. 62, 418 S.W.2d 793. Cf., however, Davis v. State, 243 Ark. 157, 419 S.W.2d 125.

"In analyzing that portion of *Miranda* opinion, quoted above, the Supreme Court of North Carolina in State v. Bishop, 272 N.C. 283, 158 S.E.2d 511, said:

" 'We do not interpret the portion of the *Miranda* opinion now under consideration to mean that when a defendant is "in custody" and has been duly advised of his constitutional rights, and he states that he does not want to make a statement at the first questioning, that law enforcement officers are forever barred from asking another question. We do interpret it to mean that when a defendant is being interrogated and he indicates that he wishes to remain silent, that interrogation must not then be continued. The vice sought to be removed is the evil of continued, incessant harassment by interrogation which results in breaking the will of the suspect, thereby making his statement involuntary.'

"In *Bishop* the defendant had been advised of his rights under *Miranda* and he indicated to the police that he did not wish to talk, and the police ceased all efforts for that day to interrogate him but resumed their interrogation the next day, preceded by the warnings and the taking of a waiver. There it was held that the second interrogation attempt was not precluded by the refusal to talk at the first such attempt, where the defendant was not pressured into changing his mind concerning his refusal to talk and he, in fact, had a sufficient amount of time to change his mind after his first refusal.

"In State v. Godfrey, 182 Neb. 451, 155 N.W.2d 438, the Supreme Court of Nebraska rejected a contention that once a defendant had indicated his desire to be left alone by the police rather than interrogated he thereby invokes his constitutional right not only to remain silent, but to have counsel, and that any subsequent statement made without the presence of an attorney is prohibited. The Court held that the fact that a defendant, as a part of the initial procedures at a police station, after full *Miranda* warnings, is asked whether he desires to make a statement at that time and answers negatively, does not automatically invoke his right to counsel and render inadmissible any subsequent statement obtained in the absence of counsel. Neither does such a factual circumstance prohibit or invalidate a later waiver voluntarily, knowingly and intelligently made.

"The Nebraska Court in *Godfrey* said:

" 'We recognize that the police cannot be permitted to

attempt an in-custody interrogation and, upon being met with a refusal, return a prisoner to his cell and then attempt to repeat the procedure periodically until a statement is obtained. However an otherwise valid voluntary waiver of both the right to counsel and the right to remain silent, knowingly and intelligently made, followed by a statement, should not be transformed into invalidity merely because of silence at some prior time. One refusal to make a statement, when that refusal is fully honored, ought not to taint the substance of the entire subsequent procedures under the circumstances here.' "

Hill v. State, Tex.Cr.App., 429 S.W.2d 481.

Adopting the above reasoning and applying it to the facts before us we find, as did the trial judge after a full hearing on the question outside the presence of the jury, that the confession was admissible.

 The defendant must have understood his rights because he invoked them earlier himself. We cannot hold that an accused has no right subsequently to change his mind and waive rights, formerly invoked, particularly where he initiates the later interrogation by expressing a desire to give a statement.

Finding no error, the judgment of the lower court is affirmed.

WALKER, P. J., and OLIVER, J., concur.

## ON PETITION TO REHEAR

GALBREATH, Judge.

There has been filed a dignified and courteous petition

to rehear in this case on behalf of the appellant, Phillip Lee Whitehead, asking us to remand to the clerk below for inclusion in the record a purported missing plea in abatement and record of a hearing on a motion for a continuance. Chapter 325, Public Acts of 1969, enacted subsequent to submission of this case to us, is cited as authority for the suggested remand. It amended T.C.A. § 20-1513 to read as follows:

*"Mistake apparent in record.*—Every mistake apparent on the face of the record may be corrected by the court at any term after final judgment, at the discretion of the court, and if it appears to the appellate court to which said record has been certified on appeal that a mistake has apparently been made in the transcribing of said record, the appellate court may remand the record to the clerk below for correction of the mistake."

It was not the purpose of the amendment to allow remands to supply deficiencies in a bill of exceptions but rather to allow the clerk to correct an apparent mistake made in transcribing the record. If matters that should have been included in the bill of exceptions to be approved by the trial court are left out and not called to the judge's attention in time to have them included, this is not the type of mistake that may be corrected. If in typing up the testimony or other parts of a bill of exceptions a mistake is made by the court reporter, attorney or whoever might be preparing it for presentation to the judge for approval, it is encumbent upon the party seeking to have the bill of exceptions authenticated to see that it is correctly made up, although the trial judge

himself is the final arbiter of what is, or is not, approved as part of the bill of exceptions.

Neither the trial judge nor the clerk can amend or alter a bill of exceptions in any way whatever after appeal. Baldwin v. State, 204 Tenn. 639, 325 S.W.2d 244; Thomas v. State, 206 Tenn. 633, 337 S.W.2d 1; Burkett v. Burkett, 193 Tenn. 165, 245 S.W.2d 185; Parrish v. Yeiser, 41 Tenn.App. 690, 298 S.W.2d 556.

In substance, we hold that T.C.A. § 20-1513, as amended, will not allow for the untimely inclusion of any matter in the bill of exceptions that was inadvertently omitted.

The remaining points urged by appellant in error for our reconsideration were, we believe, dealt with adequately in our original opinion.

The petition to rehear is denied.

WALKER, P. J., and OLIVER, J., concur.