John A. McINTYRE, Petitioner,

v.

The STATE OF NEW YORK,
Respondent.

Nos. 71–C–368, 71–C–440.

United States District Court,
E. D. New York.

June 23, 1971.

John A. McIntyre, petitioner, pro se.

Eugene Gold, Dist. Atty., Kings County, for respondent Frank Di Lalla, Asst. Dist. Atty., of counsel.

BARTELS, District Judge.

■■ Petitioner, John A. McIntyre, presently incarcerated in the Brooklyn House of Detention, seeks his release through federal *habeas corpus*. On March 24, 1969, the Appellate Division, Second Department, set aside McIntyre's convictions for the crimes of robbery in the first degree and felony murder upon the ground that there existed the possibility that race prejudice precluded him from receiving a fair trial. People v. McIntyre, 31 A.D.2d 964, 299 N.Y.S.2d 88 (1969). In the course of that opinion, the Appellate Division considered and

rejected McIntyre's claim that his confession to the crimes should be suppressed because it was taken in violation of the decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). McIntyre sought leave to appeal to the Court of Appeals, which was denied by Judge Scileppi on September 18, 1969. Prior to his retrial McIntyre sought *habeas corpus* relief in this court upon several grounds including the *Miranda* claim. This court declined to pass upon the *Miranda* issue because at that stage of the proceedings the contention was premature. Since that time petitioner has been retried and convicted, the confession being introduced into evidence. By letter dated April 20, 1971, in the form of a civil rights action, petitioner renewed his application for relief upon the *Miranda* ground and also added a claim for relief predicated upon the denial of his right to a hearing to examine the possible prejudice of the second jury. This latter claim has obviously not been exhausted and thus cannot be entertained by this court.[1] The court, however, concludes that the *Miranda* claim is now ripe for adjudication.

## I

■ The exhaustion requirement in *habeas corpus* jurisprudence is based upon the principle of comity rather than jurisdictional limitation. United States ex rel. Gockley v. Myers, 411 F.2d 216, 219 (3d Cir. 1969), cert. denied, 396 U.S. 847, 90 S.Ct. 96, 24 L.Ed.2d 96 (1970); Bell v. Alabama, 367 F.2d 243, 248 (5th Cir. 1966), cert. denied, 386 U.S. 916, 87 S.Ct. 859, 17 L.Ed.2d 788 (1967). While due regard for this principle requires that the state court hierarchy be afforded the initial opportunity to pass upon alleged claims of unconstitutional restraint (Fay v. Noia, 372 U.S. 391, 419–420, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963)), it nevertheless does not authorize this court to require a prisoner to pursue duplicate review of an issue which has

1. Petitioner cannot circumvent the exhaustion requirement by dressing a *habeas* *corpus* claim in the garb of a civil rights action.

been conclusively passed upon by the intermediate state appellate tribunal and which has been presented to the state's highest court, although such tribunal has chosen not to expressly deal with the merits of the claim. *Cf.* United States ex rel. Montgomery v. Brierley, 414 F.2d 552, 556 (3d Cir. 1969); Sheftic v. Boles, 377 F.2d 423 (4th Cir. 1967), cert. denied, 389 U.S. 986, 88 S.Ct. 476, 19 L.Ed.2d 479 (1967). The *Miranda* claim having been exhausted, we turn to a consideration of the merits.

## II

Prior to trial the *Miranda* claim was thoroughly aired at a *Huntley* hearing presided over by the Honorable Julius Helfand. The following testimony was adduced at that hearing: At about 2:30 P. M. on September 5, 1967, John A. McIntyre was arrested fleeing the scene of a grocery store robbery and was brought to the detectives' office at the 67th Precinct.[2] At approximately 3 P.M. he was advised of his rights by an Assistant District Attorney who was summoned to question him regarding the robbery which had been committed that day. McIntyre refused to answer any question "on the grounds of the Fifth Amendment." Upon his invocation of rights, questioning was immediately terminated.[3] At about 5 P.M. Detective Frank Tornabene arrived at the 67th Precinct. Tornabene had been previously assigned to investigate a robbery and homicide which occurred on August 5, 1966 at a grocery store located several blocks from the scene of the September 5th robbery. At this time he brought two women to the station house to view petitioner. Prior to speaking to McIntyre, Tornabene asked the Assistant District Attorney for permission to ask McIntyre some questions regarding a different crime, to which inquiry the Assistant responded in the affirmative provided that McIntyre was again given his *Miranda* warnings. According to Tornabene, the following then transspired:

He advised petitioner of his constitutional rights by reading from a printed form of the Police Department of the City of New York. After each question he asked McIntyre whether he understood and McIntyre responded that he did. McIntyre then signed the form and initialed a correction which had been made regarding one of the answers he had given.[4] After these preliminaries,

2. Petitioner pleaded guilty to the charge of robbery in the second degree and was sentenced on September 28, 1967 to a term of 15–30 years imprisonment for commission of this crime.

3. At the trial of the case, which followed the suppression hearing, Patrolman Anthony Raffa testified that approximately twenty minutes following McIntyre's invocation of the Fifth Amendment, McIntyre admitted to him that he had committed the September 5th robbery. Raffa testified that McIntyre volunteered this information without any question being asked of him. According to Raffa, McIntyre admitted this to him immediately after he told him that he had signed a *Miranda* card with the misnomer of Billy Ray. Raffa did not testify to this story at the *Huntley* hearing although the Appellate Division made reference to it in their opinion.

4. The transcript of the *Huntley* hearing respecting the administration of the *Miranda* warnings reads as follows:

"The Witness: I asked him what his name was and he said, 'John McIntyre.' I then said, 'You are hereby advised you have the right to remain silent and you do not have to say anything unless you choose to do so. Do you understand?' He said, 'Yes.'
"The Court: Who said this?
"The Witness: John McIntyre said 'Yes'. I then said, 'Anything you say may be used against you in a court of law. Do you understand?' McIntyre replied, 'Yes.' I then asked him, 'You have the right to have an attorney present with you during my questioning now or in the future. Do you have an attorney?' He replied, 'No'. At this point, I had put down 'Yes' and I made an error and crossed it off and asked him to initial it, which he did.
"The Court: Who initialed it?
"The Witness: John McIntyre.
"Q. You mean he initialed the correction? A. He initialed the correction. I said, 'Do you understand?' and he said, 'Yes'. Then I asked him 'If you cannot

Tornabene told McIntyre that he had been identified as having been in the grocery store which was robbed on August 5th.[5] He asked McIntyre if he could tell him where he had been on that date. McIntyre replied that he had been in Fayetteville, North Carolina. When Tornabene asked him if there was any way he could check on his answer, McIntyre replied that there was a bus ticket which would show that he came to New York on about August 17th. With permission of the petitioner, Detective John Mangan went to petitioner's apartment and returned with a bus ticket which had the date of August 2, 1966 stamped on it.[6] Petitioner attempted to explain this discrepancy by saying that he was travelling back and forth from New York and thought that the ticket had a later date on it. By question and answer, McIntyre then related what occurred on August 5, 1966. He stated that on that date he was working at the Sellick Furniture Company on Utica Avenue in Brooklyn and went to lunch at about 12 o'clock, and that during the lunch hour he went to a grocery store to buy a soda, saw some money in the store's register, reached over the counter, took the money, and when a woman ran over to where he was he pushed her and ran from the store.[7] Tornabene showed McIntyre a picture of the deceased and McIntyre said that it looked like the woman he had

pushed. Tornabene specifically denied that he had physically abused McIntyre or saw McIntyre being beaten by any other person at any time. At about 9 P.M. Tornabene along with Detective Mangan and Patrolman Raffa drove McIntyre to the vicinity of the crime and asked him to point out the store which he had robbed. McIntyre selected the right store which had since become vacant. Upon their return to the station house, Tornabene sent for an Assistant District Attorney, who arrived at the station house at about 11 P.M. After being informed of his rights McIntyre declined to make any statement to him.

At the *Huntley* hearing McIntyre testified in his own behalf to a story markedly different from the one related by Tornabene. In substance, he claimed that he was not informed of his rights by Tornabene at 6:30 P.M., that he did not sign the *Miranda* card until 11 P.M., and that he was beaten for several hours by Tornabene and another policeman until he finally confessed to the crime in order to prevent the continuation of the beatings.[8] In rebuttal, Detective Mangan, who was present for most of the interrogation, testified that McIntyre signed the card at 6:30 P.M. and further testified that he did not observe McIntyre being beaten nor did McIntyre exhibit any marks of a beating.[9]

---

afford an attorney, the Court will appoint one to represent you.' And McIntyre stated, 'I'll take one tomorrow.' I then asked him, 'If you do not have an attorney presently available, you have a right to remain silent until you have an opportunity to consult with one.' McIntyre said, 'I understand.'
"Q. Did you ask him to sign the form? A. I did.
"Q. And did he sign the form? A. Yes, he did."

5. At the trial Rosanne Sicurella testified that she viewed McIntyre at the police station and told Tornabene that she thought it was the same boy whom she had seen in the grocery store on the day of the homicide.

6. The trip to and from McIntyre's apartment consumed about one hour. Torn-

abene testified that no questioning occurred during this period.

7. The woman, Ida Kaplan, 89 years of age, died on August 9, 1966, at the Kings County Hospital.

8. McIntyre's testimony with respect to the alleged beatings was somewhat contradictory. On direct examination he stated that he was hit a number of times and then he told the police about his bus ticket. On cross-examination he stated that he had not been hit until after the police returned with the bus ticket.

9. To establish that no beatings had occurred the government introduced into evidence photographs taken of the petitioner and certain medical reports which tended to negative the claim of brutality.

At the conclusion of the *Huntley* hearing upon the August 5th robbery, the court ruled that the incriminating statements would be admissible at the trial. In so ruling, the court specifically found that there was no credible evidence supporting the claimed police brutality.[10] More importantly for this application, the court found that "the defendant was fully advised of his constitutional rights as mandated by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; that he fully understood these warnings and advice and that the People have established this beyond a reasonable doubt." The court further found that "the People have established beyond a reasonable doubt that the defendant knowingly and intelligently and without any coercion whatsoever waived his constitutional rights and freely and voluntarily made the statements sought to be excluded * * *."

The Appellate Division agreed with this ultimate determination of the lower court. It held that although it was improper to question petitioner concerning the August 5th robbery after he had asserted his *Miranda* rights with respect to the September 5th robbery, this error was cured by petitioner's knowing and intelligent waiver of his rights under the totality of the circumstances.

### III

 The determination as to whether an in-custody defendant has waived his *Miranda* rights depends in each case upon a careful analysis of the facts and circumstances of the case. United States v. Anderson, 394 F.2d 743 (2d Cir. 1968). Once a defendant has asserted his privilege to remain silent a governmental claim of waiver must be scrutinized with special care. At least one court has gone so far as to say that once the right to silence has been invoked, *all* further attempts at police interrogation must cease until counsel is appointed regardless of the development of new facts relevant to the prosecution. People v. Fioritto, 68 Cal.2d 714, 68 Cal.Rptr. 817, 441 P.2d 625 (1968). Other jurisdictions, including this Circuit, have eschewed so rigid a prophylactic rule in favor of a careful evaluation of the realities of each particular case. United States v. Brady, 421 F.2d 681 (2d Cir. 1970); United States v. Grady, 423 F.2d 1091 (5th Cir. 1970); Wilson v. United States, 398 F.2d 331 (5th Cir. 1968), cert. denied, 393 U.S. 1069, 89 S.Ct. 727, 21 L.Ed.2d 712 (1969); Jennings v. United States, 391 F.2d 512 (5th Cir. 1968); State v. Godfrey, 182 Neb. 451, 155 N.W.2d 438, cert. denied, 392 U.S. 937, 88 S.Ct. 2309, 20 L.Ed.2d 1396 (1968); State v. Bishop, 272 N.C. 283, 158 S.E.2d 511 (1968). This approach to the problem is no more than an individual application of the more general waiver rule. The high standard of proof needed to establish a waiver of constitutional rights adopted in Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and reasserted in Miranda v. Arizona, 384 U.S. at 475, 86 S.Ct. 1602, was stated in *Johnson* as follows:

> "It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." (304 U.S. at 464, 58 S.Ct. at 1023).

Applying this test to the facts of the instant case, this court is compelled to agree with the state court's finding that McIntyre knowingly, intelligently and voluntarily waived his right to remain

---

10. In this *habeas corpus* action, McIntyre does not predicate his request for relief upon any claim of brutality.

silent with respect to the questioning by Detective Tornabene.

The hearing judge specifically resolved the disputed factual issues in favor of the government. Since this determination is amply supported by the record of a full and fair hearing, this court has no justification for reexamining these findings of historical facts. 28 U.S.C. § 2254 (d). A review of the state court record reveals that petitioner was clearly aware of his rights under the *Miranda* ruling. Indeed, he had expressly invoked the shield of the Fifth Amendment when questioned by the Assistant District Attorney with respect to the September 5th robbery. In addition, prior to any questioning regarding the August 5th murder, petitioner was again informed in detail of his rights under the *Miranda* ruling. Petitioner not only verbally stated that he understood the warnings but also signed the Police Department form and initialed a correction thereon. There was no credible evidence adduced at the *Huntley* hearing suggesting that petitioner's age, mental condition or emotional state precluded him from having a practical appreciation or understanding of the rights with respect to which he evidenced an intellectual comprehension. This was not McIntyre's first involvement with the law; he had been convicted of common law robbery in North Carolina and escaped after having served some time in prison. Also, as noted by the Appellate Division, McIntyre had completed one year of college. It must be remembered that McIntyre's willingness to talk with the police concerning the August 5th robbery in spite of the *Miranda* warnings followed his being told that a witness had placed him at the scene of the crime. Initially he tried to exculpate himself by stating that he was out of town on that date and attempted to substantiate this alibi by telling the police about the bus ticket. It was only after this effort proved fruitless that he admitted his participation in the crime.

██ Of significance to this court, although not to the Appellate Division, is the fact that Tornabene's questioning of McIntyre involved the August 5th robbery, a crime separate and distinct from the September 5th robbery, the one with respect to which McIntyre had asserted his *Miranda* rights. A major purpose of the *Miranda* decision was to promote a free and informed choice on the part of the defendant of whether or not to remain silent and whether or not to request counsel. From the fact that a defendant has chosen to remain silent about one crime, it does not automatically follow that he also desired to remain silent with respect to an entirely different crime. The facts of this case bear no resemblance to those of Westover v. United States, 384 U.S. 436, 494–497, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), where the Supreme Court ruled that a confession secured by an F.B.I. interrogation preceded by warnings but which followed an interrogation by state police was improperly obtained. There the Supreme Court refused to find a waiver of the right to remain silent because the interrogation by the state police was without warnings and lasted for a period of about twelve hours. The court ruled that the effect of the combined state and federal interrogation was that of one long interrogation where the defendant was not informed of his rights at the outset. Here McIntyre was informed of his rights by the Assistant District Attorney at the time of the initial questioning. Thus no improper interrogation and, in fact, no interrogation whatsoever preceded the questioning by Tornabene.

██ To be sure, periodic interrogation of a defendant about one crime or many crimes in the face of his manifested desire to be let alone would be contrary to the mandate in *Miranda*. But here the questioning involving the murder charge began only after Tornabene had secured an identification of McIntyre by a witness who had been at the scene of the crime just prior to the homicide. In these circumstances, the renewed questioning by Tornabene "does not appear to have been designed to subvert the *Miranda* rule." United States v.

Brady, *supra*, 421 F.2d at 683. Aside from any questions of governmental good faith, it is this court's conclusion that no subversion of *Miranda* did in fact occur. To the contrary, the waiver of rights in this case appears to have been the product of an informed, intelligent and voluntary choice on the part of petitioner.

Accordingly, this application for a writ of *habeas corpus* must be and hereby is denied. So ordered.